Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

(Cite as: 2000 WL 1346688 (D.Del.))

Page 1

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Joan C. KEY, Plaintiff,
v.
Sherese BREWINGTON-CARR, et al., Defendants.
No. Civ.A. 98-152-GMS.

Sept. 6, 2000.

William D. Fletcher, Jr. and Noel E. Primos of Schmittinger & Rodriguez, Dover, Delaware, for Plaintiff Joan Key.

Kevin J. Connors of Marshall, Dennehy, Warner, Coleman & Goggin, Wilmington, Delaware, for the Medical Defendants.

Robert W. Willard of the State of Delaware Department of Justice, Wilmington, Delaware, for the State Defendants.

*AMENDED MEMORANDUM OPINION*

SLEET, J.

I. INTRODUCTION.

*1 In March of 1996, Joan Key entered the Baylor Women's Correctional Institute ("BWCI") to serve a brief prison sentence. While she was incarcerated, Key began to hallucinate and exhibit other bizarre behavior. Consequently, she was twice transferred from BWCI to the Gander Hill prison infirmary for care and observation. Eventually, Key was moved to a state hospital. There, the doctors concluded that Key was probably suffering from withdrawal because she had not been given a substitute for one of the prescription medications that she had brought with her to the prison. One week later, Key was re-admitted to the same state hospital because she was bleeding internally. Apparently, one of her other prescriptions had run out without being refilled by the prison medical staff. As a result, Key's stomach lining became irritated to the point that she was experiencing gastric bleeding.

In 1998, Key filed suit against virtually every member of the medical staff who came into contact with her during her period of incarceration. She also sued four prison officials. According to Key, all of these individuals violated her Eighth Amendment right to be free from cruel and unusual punishment. Key claims that the prison medical personnel refused to provide her with an appropriate substitute for her prescription medication. This, she alleges, led to her severe withdrawal symptoms and psychotic episodes. Key also claims that the medical personnel allowed one of her other prescriptions to lapse, resulting in internal gastric bleeding. Finally, Key claims that the wardens and deputy wardens of the institutions where she was incarcerated failed to adequately treat her medical needs and failed to protect her from attacks by other prison inmates or correctional officers.

Key has also brought a number of state law claims against these defendants. *See* 28 U.S.C. § 1367 (1994) (allowing the court to exercise supplemental jurisdiction over related claims). For example, Key alleges that Correctional Medical Services, Inc. ("CMS") and the members of its staff acted recklessly or with gross or wanton negligence by failing to provide her with the proper standard of care. Key further alleges that the prison officials acted deliberately, recklessly, or with gross or wanton negligence in failing to provide her with proper medical care as required by prison regulations. In addition, Key claims that she has suffered severe emotional distress as the result of the defendants' intentional or reckless misconduct or gross or wanton negligence.

For these alleged wrongs, Key has sought compensatory and punitive damages in addition to attorneys fees and costs. All of the defendants have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 2
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

moved for summary judgment in one form or another.

In general, the prison officials argue that they cannot be held liable because, for the most part, they were not personally involved in Key's medical care. To the extent that they were involved, they contend, they did not interfere with her treatment or deny her medical care in any way. Instead, they merely recommended that Key should follow the course of treatment which had been prescribed by the prison doctors. Given their conduct, no reasonable jury could conclude that these officials were deliberately indifferent to Key's medical condition. Nor does it appear that these administrators were personally involved in any misconduct which might have occurred. Therefore, the court will grant summary judgment in their favor.

*2 The court will also grant summary judgment in favor of virtually every member of the prison medical staff on Key's constitutional claims. In light of the record, no reasonable jury could conclude that the overwhelming majority of the medical personnel acted with conscious disregard for Key's medical condition. In fact, a large number of these individuals do not appear to have done anything improper. For this reason, the court will require Key to show cause why her state law claims against several members of the medical staff should not be dismissed. In short, given the evidence, it does not appear as if a reasonable jury could conclude that these individuals acted recklessly or with gross or wanton negligence.

Nevertheless, the court will allow the federal claims against one of the physicians to proceed because, when the record is viewed in the light most favorable to Key, a reasonable jury could conclude that his failure to prescribe her an adequate substitute for her psychotropic medication violated her right to be free from cruel and unusual punishment. Because this conduct could also support a finding of reckless, wanton, or grossly negligent behavior, the court will not require Key to show cause as to this defendant.

The following sections explain the bases for these rulings in greater detail.

II. STANDARD OF REVIEW.

The court can only grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c) (2000). An issue is "genuine" if, given the evidence, a reasonable jury could return a verdict in favor of the non-moving party. *See Baker v. Lehman,* 932 F.Supp. 666, 669 (E.D.Pa.1996) (citing *Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A fact is "material" if, under the governing law, it might affect the outcome of the case. *See id.* (citing same). On summary judgment, the court must look at the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all reasonable doubts in favor of that party-here, Key. *See Hamilton v. Leavy,* 117 F.3d 742, 746 (3d Cir.1997); *Young v. Quinlan,* 960 F.2d 351, 357 (3d Cir.1992). With these standards in mind, the court turns to a discussion of the most relevant facts giving rise to this lawsuit.

III. BACKGROUND.

During her period of incarceration, Key was seen by numerous medical personnel. She was twice transferred from BWCI to Gander Hill for treatment and observation. She was also twice sent to Riverside Hospital.

A. March 28th.

On March 28, 1996, Key was admitted to BWCI after pleading guilty to her third DUI offense. Although she arrived with a supply of personal medications which her treating physician had prescribed to her, all of these items were confiscated by the medical staff pursuant to prison policy. These internal regulations prohibit an inmate from possessing personal medications while incarcerated unless a prison doctor has examined the medicine and verified its contents. Apparently, the policy is intended to prevent inmates from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

smuggling controlled substances or other contraband into the prison under the guise of prescription medication.

*3 During Key's initial intake interview, Kim Moore, L.P.N. took a full medical history. Key told the nurse that she was taking three different medications: (1) Prilosec for her gastritis, which is an irritation of the stomach lining; (2) Prozac for her anxiety disorder and depression; and (3) Klonopin to curb her panic attacks.

After examining the Prilosec, the staff physician who was on duty at the time (James Thomas, M.D.) approved the medicine for Key's personal use. Because Dr. Thomas was not a psychiatrist, however, he could not verify the contents of Key's supply of Prozac or Klonopin. For this reason, Nurse Moore contacted the staff psychiatrist (Antonio Sacre, M.D.) by telephone and informed him of the situation. Dr. Sacre told Nurse Moore to give Key two Prozac substitutes, Vistaril and Desipramine. He did not prescribe a Klonopin substitute at this time. [FN1]

> FN1. As the court will discuss, there is a dispute over whether Dr. Sacre knew about Key's Klonopin prescription. Dr. Sacre has testified that he does not remember being told that Key was taking Klonopin. However, according to Nurse Moore, when she spoke with Dr. Sacre over the telephone, she informed him that Key was taking this medication.
> In any event, during the initial assessment, Nurse Moore noted on Key's chart that she was taking twenty milligrams of Prilosec and twenty milligrams of Prozac daily in addition to a total of five milligrams of Klonopin per day. It seems as if Dr. Sacre never reviewed this portion of Key's chart while he was treating her.

Upon learning that she would not be allowed to take her own personal supply of Klonopin or Prozac, Key became very upset and demanded that she be given her own medications. However, because Dr. Sacre had not personally verified the contents of Key's Prozac and Klonopin prescriptions and because these medications were not part of the prison formulary, Key's request was denied pursuant to prison policy.

B. April 1st.

Within the next few days, Key visited the prison infirmary in an attempt to convince someone on the medical staff to provide her with her personal medications. In particular, on April 1st, Key approached Linda Evans, R.N. under the pretense of asking for eye drops. Key, however, immediately changed the topic of conversation to her medications. When Nurse Evans informed Key that she could not prescribe her Prozac because she was not a doctor, Key then approached a physician (Benjamin Robinson, M.D.) who happened to be standing in the hallway. Immediately, Key began asking him about her medications. Nurse Evans, however, put a stop to this line of questioning, explaining that Dr. Robinson was not a psychiatrist. As a result, he could not issue Key a prescription for Prozac or Klonopin. Nor could he examine her personal supply of these drugs to verify them. Disregarding these comments, Key approached Dr. Robinson for a second time as soon as Nurse Evans began to return to her duty station. Out of apparent frustration with this conduct, Nurse Evans told Key that she could be "locked down" in her cell if she did not cease her drug-seeking behavior.

C. April 2nd.

The following day, Jean Long, R.N. was called to Key's cell because she was asking a correctional officer about her personal medications. By this time, Key had already spoken with at least four different nurses about receiving her supply of Klonopin and Prozac.

Because Key was refusing to take the medications which Dr. Sacre had prescribed, Nurse Long ultimately contacted Patrick Ryan, the Warden of BWCI, who met with Key to discuss the situation. Ryan told Key that even though she could not take her personal medications, substitutes from the prison formulary could be provided. Ryan also told

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d								Page 4
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

Key that, to the extent that she remained displeased with the treatment that she was receiving, one of the nurses could contact her personal physician and obtain his recommended course of treatment.

*4 As a result, Nurse Long subsequently spoke with Key's private doctor over the telephone to discuss the matter with him. During their conversation, the physician told Nurse Long that Key had a history of abusing both prescription drugs and alcohol. For this reason, Key's doctor recommended placing her on a Klonopin substitute, such as Ativan. According to Nurse Long, she then spoke with Dr. Sacre, telling him about her conversation with Key's personal physician. [FN2] In response, Dr. Sacre apparently adjusted the level of the Prozac substitutes which he had prescribed to Key. He, however, did not prescribe Key a substitute for the Klonopin which she had been taking.

> FN2. Again, there is a dispute over whether Dr. Sacre knew of Key's Klonopin prescription. According to Nurse Long, she informed Dr. Sacre that Key had been taking Klonopin prior to her incarceration. Dr. Sacre, however, has testified that he does not remember being provided with this information.

D. April 4th.

On April 4th, Dr. Thomas examined Key. Noting that she was experiencing slight tremors, he became concerned that Key might be suffering from Prozac withdrawal. Consequently, he referred Key to Dr. Sacre who saw her later that day. After completing his evaluation, Dr. Sacre concluded that Key was probably suffering from withdrawal given her history of alcohol and prescription drug abuse. However, it does not seem as if Dr. Sacre reached the specific conclusion that Key might be suffering from Klonopin withdrawal. Also, it is not clear what steps Dr. Sacre took in response to his diagnosis that Key was experiencing prescription drug and alcohol withdrawal.

E. April 5th.

The next day, Key was found jogging outside of the prison. She was brought to Nurse Long who noticed that Key was shaking uncontrollably and disoriented. For this reason, the nurse paged Dr. Sacre who immediately transferred Key to the Gander Hill infirmary for medical observation.

At Gander Hill, Key was examined by Beverly Auld, R.N. During the assessment, Key was exhibiting slight tremors. She also asked Nurse Auld, "Do you think that anyone will kill me?" Consequently, Nurse Auld suspected that Key might be suffering from alcohol withdrawal. After reviewing Key's chart and speaking with Nurse Auld, Dr. Robinson agreed with this assessment. [FN3] He, therefore, approved the use of a Serax protocol to treat Key's condition.

> FN3. Dr. Robinson, however, never actually saw Key that day. Instead, he based his decision on his review of Key's chart and Nurse Auld's comments.

Richard McLaughlin, who worked in the Mental Health Unit, also saw Key that day. He noted that Key appeared to be confused. Based on his observations and a review of Key's chart, he concluded that she was probably suffering from alcohol and prescription drug withdrawal.

F. April 6th.

The following day, Rebecca Panichelli, R.N. took Key's vital signs. In the process, she noted that Key was experiencing slight tremors. Barbara Lewis, L.P.N. also observed Key on April 6th. She noted that Key mistook a correctional officer for her son. In addition, Key was exhibiting mild tremors. Based on these observations and Dr. Robinson's diagnosis, Nurse Lewis believed that Key was probably suffering from alcohol withdrawal.

G. April 7th.

As her vital signs were being taken on April 7th, Key told Nurse Panichelli that she was feeling better and that she wanted to return to BWCI. Apparently, Key did not exhibit any tremors during

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

their conversation. When Nurse Lewis met with Key, she noted that Key was refusing the medications which had been prescribed to her by the prison doctors. Instead, she wanted her personal supply of Klonopin and Prozac.

H. April 8th.

*5 In the early morning hours of April 8th, Jane Booz, R.N. observed Key pacing around her cell. During the shift, Key told the nurse that she felt like she was going to swallow her tongue. Consequently, Nurse Booz inspected Key's tongue and saw no abnormalities. She also observed that Key was able to swallow water. Therefore, she simply noted Key's comments in her progress notes. She did not take any further medical action. Nurse Booz also noted that Key should continue to be monitored. She further recommended that someone should speak to a physician about the possibility that Key might be suffering from withdrawal given the prescription medications that she was taking prior to her incarceration. Because Nurse Booz was working the night shift at the time, she was apparently unable to pass these comments on to a doctor directly.

Later that day, Nurse Panichelli again took Key's vital signs and blood pressure. At the time, Key still exhibited tremors. She also appeared "anxious" and told Nurse Panichelli that she wanted to leave the Gander Hill infirmary. Key also stated that she had vomited after one of her meals.

I. April 9th.

Key was transferred back to BWCI on April 9th. The first discharge order was signed by Ingrid Williams, R.N. It noted that Key should "avoid alcohol" given her condition. The second discharge order was signed by Betty Bradley, R.N. It explained that Key was "stable, alert, [and] oriented" even though "slight trem [ors were] still noted." This discharge report also directed the medical staff at BWCI to "continue medications as ordered." When Key returned to BWCI, the medical staff noted mild tremors in Key's hands. Her mood, however, was "calm."

J. April 12th.

It appears as if the next few days passed without incident. However, on April 12th, Key stabbed herself in the arm with a plastic fork. She was then taken to Nurse Long who cleaned and dressed the wound. As Key was being treated, she told Nurse Long that, like Jesus, she had "blood dripping down h[er] hands," therefore, she should be "punish[ed]" by being placed in "isolation."

Key was also seen by Isabelle Nye, a social worker, that day. During their meeting, Key told Nye that she could hear "Gary's voice" and that Gary was laughing at her. Key also refused to open her eyes during this conversation. Based on what she had observed, Nye recommended that Key be transferred to Gander Hill for observation.

Given these events, Dr. Sacre again transferred Key to the Gander Hill infirmary, placing her on full suicide watch. As a result, Key was observed by the nursing staff at least once an hour. Correctional officers monitored her condition once every fifteen minutes.

K. April 13th.

The next day, Nurse Williams noted that Key spent most of the shift sitting on the floor behind the door of her cell. She "appear[ed] to be scared." She was also shaking. Based on these observations, Nurse Williams suspected that Key was experiencing the DT's or delirium tremens, which are a side effect of alcohol withdrawal.

L. April 14th--16th.

*6 On April 14th, Lauren Koston, R.N. observed Key, noting that she appeared to be depressed. Later that day, Jacqueline Brittingham, R.N. observed Key in her cell. At the time, Key was lying naked on the floor. She was also acting "bizarre." Based on these observations, Nurse Brittingham made a notation that Key should continue to be monitored.

The next day, Nurse Booz observed that Key was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

lying naked on the floor and performing swimming motions. Key was also urinating on the floor and playing with the water in the toilet. Nurse Panichelli and Nurse Williams made similar observations that day. It seems that Key told one of these nurses that she would only take Klonopin and Prozac. Apparently, she did not want any other medications. Dr. Sacre also observed Key on April 15th. Given her bizarre behavior, he placed Key on Trilafon, another psychotropic medication.

Key appeared more calm the following day. However, she was still refusing to wear her hospital gown. When McLaughlin met with Key, he noticed that her cell was "messy" and that her personal hygiene was "poor." Given these observations, Dr. Sacre apparently increased the level of Key's Trilafon dosage.

M. April 17th.

In the early morning hours of April 17th, Nurse Booz saw Key wandering around her cell making motions as if she were showering or swatting insects. Later, the nurse observed Key bang her elbows and pound her fists on her thighs and on her mattress. The nurse, however, did not enter Key's cell to try to stop this behavior because there were no correctional officers available to provide a security escort. Since Key posed a threat to the safety of others, Nurse Booz remained outside of the cell. Ultimately, Key's self-destructive behavior subsided. Nurse Booz made a notation of this conduct in Key's medical records. During her shift, Nurse Panichelli also noted that Key's nose had been bruised and was slightly swollen.

Later that day, Key claimed that she could not see. For this reason, Nurse Brittingham conducted a brief eye examination. During the test, the nurse noted that Key was able to make positive eye contact with her as they were talking. Nurse Brittingham also noted that Key was still experiencing some tremors in her arms. Based on her observations, the nurse recommended that Key remain on full suicide watch because there was still the "potential for self-harm" even though Key had denied having any suicidal ideation.

Nurse Williams also observed Key that day, noting that she appeared to be confused and was continuing to disrobe. Although Dr. Sacre initially increased Key's Trilafon dosage in response to Key's symptoms, he took her off the medication later that day.

N. April 18th.

The following day, Nurse Panichelli observed Key sitting on her mattress. She refused to make eye contact. Furthermore, she was exhibiting mild tremors. As Nurse Koston was taking Key's vital signs, she spoke with Key about her medications. During their conversation, she could not convince Key that she was no longer taking Trilafon.

*7 Carl Desmond, who worked in the Mental Health Unit, also spoke with Key that day. At the time, she was sitting on the floor, shivering. When Desmond asked if she was cold, she stated that she was not. During their conversation, Key asked about her personal supply of Klonopin and Prozac. It does not appear that Desmond passed Key's request for these medications on to the nursing staff or a physician.

Based on his conversation with Key, Desmond concluded that she was thinking much more clearly than when she had stabbed herself in the arm a few days earlier. Because it did not appear as if Key was a danger to herself, Desmond recommended taking her off of full suicide watch.

Dr. Sacre apparently concurred. After meeting with Desmond, he downgraded Key's condition from suicide status to psychiatric close observation.

O. April 19th.

On April 19th, Anne Marie Hill, R.N. noted that Key appeared to be confused about where she was. Nurse Hill also observed that Key had scattered bruises on her face, arms, and legs. Nurse Hill reported these bruises to the nurses on the next shift. At her deposition, Nurse Hill also explained that the doctors were already aware of the situation. Later that day, Nurse Brittingham noted that Key

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 7
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

was able to make positive eye contact and was also taking her medications. She, however, continued to experience tremors in her arms.

When Desmond spoke with Key that day, he noted that she was regressing to her earlier delusional state. For example, she believed that she was on her way to school. She also thought that her mother was in the room. It seems that Desmond suspected that Key's regression might have been caused by Dr. Sacre's decision to take her off of Trilafon. Consequently, Dr. Sacre reinstated Key's Trilafon prescription.

P. April 20th--22nd.

On April 20th, during the night shift, Magdie Samuels, L.P.N. noted that Key appeared to be confused and disoriented. She was also continuing to tear apart her paper gowns.

The following day, Nurse Samuels noted that Key remained confused and disoriented. She still continued to shred her paper gowns. She was also experiencing tremors in her hands and arms, and her skin was pale, cool, and dry. That night, Key stayed awake through the entire shift. Nurse Koston reported that Key was hallucinating again. In particular, she was seeing rats. In response, Dr. Sacre placed Key back on suicide status. He also sedated her. Because Key had been placed back on full suicide watch, the nursing staff resumed their hourly checks on her, and correctional officers stopped by her cell every fifteen minutes. Given Key's hallucinations, Dr. Sacre also increased the level of her Trilafon dosage.

The next day, Nurse Booz observed that Key was resting on her bed. She was still experiencing moderate tremors. Dr. Sacre also visited Key. He noted that she was restless and that she was experiencing auditory hallucinations.

Q. April 23rd.

*8 On April 23rd, Sharon Hailey-Angelo, R.N. spoke with Key, noting that she was experiencing a "flight of ideas." In other words, Key would jump from one topic of conversation to another. Key also believed that her face was turning to wood. She was, therefore, experiencing tactile hallucinations. Nurse Koston also noted that Key was continuing to hallucinate. She was further exhibiting slight tremors.

McLaughlin also observed mild tremors when he met with Key that day. He further noted that Key's pattern of speech was "tangential and circumstantial." Put differently, she was continuing to experience a flight of ideas.

Like several of her colleagues, Nurse Panichelli also noted that Key was experiencing slight tremors. She further noted that Key was hallucinating. In particular, she believed that her son was standing next to the window in her cell.

R. April 24th.

By the following day, Key's condition seems to have improved somewhat. Nurse Hailey-Angelo noted that Key was awake during the entire shift and made no complaints. However, when Desmond spoke with Key, she told him that her son had recently visited her. As a result, Desmond believed that Key was experiencing delusions again. In addition, Nurse Koston observed that Key was experiencing visual and auditory hallucinations. She also noted that Key was continuing to disrobe and that her speech was garbled. Nurse Panichelli noted that Key was somewhat disoriented and still experiencing mild tremors. At some point in time during this day, Christine Jones, L.P.N. administered the dose of Trilafon which Dr. Sacre has prescribed.

S. April 25th.

On April 25th, Key remained awake for most of the night shift. She exhibited moderate tremors. Over the course of the night, Nurse Booz provided Key with water upon request. Key, however, drank so much liquid that she later vomited.

When Dr. Sacre saw Key, it did not appear as if she was responding to the medication that he had

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                       Page 8
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

prescribed. He, therefore, considered a neurological evaluation to rule out the possibility of a lesion in Key's central nervous system. In addition, Dr. Sacre concluded that Key should be referred to the Delaware State Hospital if her condition did not improve.

T. April 26th.

In the morning, Nurse Brittingham noted that Key was "disoriented." She was unable to carry out verbal commands and was unsteady on her feet. Nurse Booz observed Key lying on the floor. She was picking at the air and laughing uncontrollably.

In addition, a correctional officer asked Nurse Lewis to check on Key because she was bleeding from her head. Nurse Lewis then cleaned and treated a small laceration on Key's scalp. The nurse also appears to have seen bruising on the bridge of Key's nose and on her chin. In addition, Key's elbows were black and blue.

Later that day, Martha Boston (a clinical psychologist who served as the Director of the Mental Health Unit) observed Key on the floor of her cell. She had again torn off her paper gown and was shaking. Based on these observations, Dr. Boston recommended that Key be transferred to the Delaware State Hospital for Psychiatric Observation. Dr. Sacre concurred and signed the transfer order that day.

U. April 27th--April 30th.

*9 When Key entered the Riverside Hospital, the medical staff noted several bruises on her face, neck, and back. They also noted the scalp laceration. When asked, Key apparently told one of the correctional officers who had accompanied her to the hospital, "Nobody did anything to me." Eventually, the medical staff was able to stabilize Key's condition through the use of Ativan, which was apparently prescribed by Dr. Thomas. On the discharge report, he noted that Key may have been suffering from Klonopin withdrawal.

V. May 2nd.

Finally, on May 2, 1996, Key was re-admitted to Riverside Hospital because she was vomiting blood. Evidently, Key's supply of Prilosec had run out three weeks earlier. During this time, her prescription was not refilled. Nor was she given a substitute for the medication from the prison formulary. As a result, the irritation of her stomach lining worsened to the point that she was bleeding internally. Upon admission to the hospital, Dr. Thomas recognized what had occurred and prescribed Zantac, an appropriate substitute for Prilosec.

IV. DISCUSSION.

Key has filed suit against nearly forty defendants. These individuals range from the doctors and nurses who treated Key when she first entered BWCI to the various medical professionals with whom she came into contact during the course of her incarceration. Key has also sued the wardens and deputy wardens of BWCI and Gander Hill. According to Key, all of these defendants violated her constitutional rights while they were acting under the color of state law. *See* 42 U.S.C. § 1983 (1994). [FN4]

> FN4. Key has also brought state law claims of recklessness and gross or wanton negligence against the medical personnel. Key has further brought emotional distress claims against all of the defendants. Although the medical defendants did not move for summary judgment on these state law claims, the evidence suggests that several of the medical defendants lacked the requisite state of mind to give rise to a finding of recklessness, wantonness, or gross negligence. For this reason, the court will require Key to show cause why a number of her state law claims should not be dismissed. This aspect of the court's ruling is discussed later on in this opinion.

For the purposes of their motions, the defendants have essentially conceded that they were acting under the color of state law at the time that these events occurred. *Cf. Cespedes v. Coughlin,* 956

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.Supp. 454, 465 (S.D.N.Y.1997). They, however, dispute whether they violated any of Key's constitutional rights. Key contends that her right to be free from cruel and unusual punishment was violated because the defendants were deliberately indifferent to her serious medical needs. The defendants disagree.

As the United States Supreme Court has explained,
 deliberate indifference to [the] serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.
*See Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation and footnotes omitted); *see also Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir.1987) (citing *Estelle* ).

In order to be held liable under this standard, a defendant must have acted with the "obduracy and wantonness" akin to "conduct that includes recklessness or a conscious disregard of a serious risk." *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir.1999); *see also Watson v. Canton*, 984 F.2d 537, 540 (1st Cir.1993) ("[D]eliberate indifference may ... reside in 'wanton' decisions to deny or delay care, where the action in reckless, 'not in the tort law sense but in the appreciably stricter criminal law sense, requiring actual knowledge of impending harm, easily preventable." ').

*10 The Supreme Court has defined "wanton" as
 reckless-without regard to the rights of others.... Wantonly means causelessly, without restraint, and in reckless disregard for the rights of others. Wantonness is defined as a licentious act of one [person] towards ... another, without regard to his [or her] rights; it has also been defined as the conscious failure by one charged with a duty to exercise due care and diligence to prevent an injury after the discovery of the peril, or under circumstances where [the person] is charged with a knowledge of such peril, and being conscious of the inevitable or probable result of such failure.
*See Smith v. Wade*, 461 U.S. 30, 39-40 n. 8 (1983) (quoting 30 *American and English Encyclopedia of Law* 2-4 (2d ed.1905)); *see also* Black's Law Dictionary 1418-19 (5th ed.1979) (defining "wanton" as "[r]eckless, heedless, [or] malicious; characterized by extreme recklessness or foolhardiness; recklessly disregardful of the rights or safety of others or of consequences").

Thus, in order to establish an Eighth Amendment violation, an inmate must demonstrate that the defendants consciously disregarded a substantial risk of serious harm to her health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 838 (1994). An inmate's medical condition is "serious" when it is so obvious that an ordinary person would easily recognize the need for a doctor's attention or when a physician has concluded that treatment is required. *See Lanzaro*, 834 F.2d at 347. In addition, the "condition must be such that a failure to treat [it] can be expected to lead to substantial and unnecessary suffering, injury or death." *See Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir.1991) (citing *Lanzaro* ).

A. The medical personnel.

As mentioned earlier, Key has filed suit against more than thirty members of the prison medical staff. These individuals range from the doctors and nurses who treated Key throughout her period of incarceration to the mental health and social workers who may have observed Key on one or two occasions while she was being housed in the prison infirmary or at Riverside Hospital.

Pursuant to Section 1983, Key can recover against any one of these individuals as long as she can demonstrate that they acted with conscious disregard for her serious medical needs. *See, e.g., Farmer*, 511 U.S. at 837- 38; *Lanzaro*, 834 F.2d at 346. To make this showing, Key must establish that the defendants: (1) were aware of facts that would give rise to an inference that she faced a substantial risk of serious harm; (2) actually drew this inference; but (3) disregarded this risk; and (4) as a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

result, caused her injuries. *See Farmer,* 511 U.S. at 837; *Hamilton,* 117 F.3d at 746-48 (relying on *Farmer* ).

Key, however, cannot recover if the defendants were merely negligent in failing to provide her with the proper degree of medical care. *See, e.g., Rouse v. Plantier,* 182 F.3d 192, 196-97 (3d Cir.1999). As the Third Circuit has repeatedly explained, simple negligence or medical malpractice does not give rise to a constitutional claim because mere inadvertence or neglect does not rise to the level of cruelty or wantonness prohibited by the Eighth Amendment. *See, e.g., Lanzaro,* 834 F.2d at 346 (relying on *Estelle,* 429 U.S. at 106 & n. 14); *see also Rouse,* 182 F.3d at 197 ("[C]laims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference." '); *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir.1993) ("[T]he law is clear that simple medical malpractice is insufficient to present a constitutional violation.") (cited in *Rouse* ). [FN5]

> FN5. Admittedly, there appears to be a dispute within the circuits as to whether gross negligence can give rise to a finding of liability under Section 1983. *See Salas v. Carpenter,* 980 F.2d 299, 307 & n. 6 (5th Cir.1992) (collecting the cases); *see also Manarite v. City of Springfield,* 957 F.2d 953, 956 (1st Cir.1992) (explaining that the term "deliberate indifference" means "more than ordinary negligence and probably more than gross negligence").
> In general, in order to be held liable under Section 1983, the defendants must have some degree of awareness or appreciation that their actions will, or are likely to, result in serious harm to the plaintiff. *See, e.g., Mitchell v. Maynard,* 80 F.3d 1433, 1442 (10th Cir.1996) (requiring the defendant to "disregard[ ] a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights"); *see also Torraco v. Maloney,* 923 F.2d 231, 234 (1st Cir.1991) (explaining that the defendant's actions must be "so dangerous ... that ... knowledge of a large risk can be inferred").
> Most of these cases have also explained that simple negligence fails to satisfy this standard because the failure to exercise due care does not rise to the level of an affirmative abuse of governmental authority or power. *See, e.g., Daniels v. Williams,* 474 U.S. 327, 331-32 (1986). However, the Supreme Court has not resolved whether grossly negligent conduct rises above this threshold. *See id.* at 334 n. 3. Again, the circuits appear to be split. *Compare Woodward v. City of Worland,* 977 F.2d 1392, 1399 n. 11 (10th Cir.1992) ("Neither simple nor gross negligence implies an intentional and deliberative violation of constitutional rights, and consequently neither form of negligence satisfies the scienter requirement of [Section] 1983.") (quoting *Woodward v. City of Worland,* 977 F.2d 1392, 1399 n. 11 (10th Cir.1992) *with Blyden v.. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (explaining that a supervisor "may be personally liable if he ... was grossly negligent in managing subordinates who caused the unlawful condition or event") (relying on *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).
> The term "gross negligence" is generally defined as:
> The intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another.
> It is materially more want of care than constitutes simple inadvertence. .... It is a heedless and palpable violation of legal duty respecting the rights of others....
> ...
> ... That entire want of care which would raise belief that [the] act or omission complained of was [the] result of conscious indifference to rights and welfare of persons affected by it.....
> *See Black's Law Dictionary* 932-33.
> However, as this source makes clear, gross

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 11

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

negligence "falls short of being such reckless disregard of probable consequences as is equivalent to a wilful and intentional wrong." *Id.* at 933.

Thus, to the extent that "gross negligence" equates with a "reckless disregard" for or a "conscious indifference" to another's rights, the court believes that it satisfies the standard for liability under Section 1983. *Cf. Thomas v. Booker,* 784 F.2d 299, 304-05 (8th Cir.1986) (placing the emphasis on whether the defendants acted with "a callous indifference or a thoughtless disregard" for the consequences of their actions).

*11 Therefore, when a medical professional simply chooses between two equally appropriate forms of treatment, there is no constitutional violation even though the prisoner may not agree with or be displeased by the doctor's course of action. *See, e.g., Andrews v. Camden County,* 95 F.Supp.2d 217, 228 (D.N.J.2000); *see also Bednar v. County of Schuylkill,* 29 F.Supp.2d 250, 253 (E.D.Pa.1998) ("A disagreement between the doctor and the plaintiff as to the medical diagnosis and treatment does not constitute deliberate indifference."). Likewise, a disagreement between two physicians over the proper course of treatment does not give rise to a constitutional violation since "[t]here may ... be several acceptable ways to treat an illness." *See White v. Napoleon,* 897 F.2d 103, 110 (3d Cir.1990).

Instead, in order to establish a viable claim of deliberate indifference, Key must show that the defendants: (1) were aware of her need for medical treatment yet intentionally refused to provide it; (2) delayed necessary medical treatment for a non-medical reason; (3) prevented her from receiving needed or recommended medical treatment; or (4) persisted in a particular course of treatment, knowing that this approach would inflict severe pain on her or pose a serious risk of permanent injury. *See, e.g., Rouse,* 182 F.3d at 197 (collecting the cases).

1. Dr. Sacre.

In this case, Key alleges that Dr. Sacre was deliberately indifferent to her medical needs because he failed to prescribe her Klonopin or an appropriate substitute. As a result, Key claims, she experienced severe withdraw symptoms, including hallucinations, tremors, and psychotic episodes.

According to Dr. Sacre, he does not remember being told that Key was taking Klonopin. Thus, he contends, he was not aware of any facts that would give rise to an inference that Key faced a substantial risk of serious harm. However, Nurse Moore has testified that she informed Dr. Sacre about Key's Klonopin prescription on March 28, 1996-the day that Key entered BWCI and Nurse Moore conducted the initial intake interview. [FN6] In addition, Nurse Long has testified that after speaking with Key's personal physician on April 2nd, she told Dr. Sacre that this practitioner recommended prescribing Key a Klonopin substitute, such as Ativan, to lessen the likelihood of withdrawal and its accompanying symptoms.

> FN6. While the medical history which Nurse Moore took on that day plainly lists Klonopin as one of the three medications that Key was taking, it seems that Dr. Sacre did not review this portion of Key's chart. However, the failure to review a patient's medical chart is generally considered to be at most negligent and, thus, does not usually give rise to a finding of liability under Section 1983. *See, e.g., Stewart v. Murphy,* 174 F.3d 530, 534 (5th Cir.1999) ("At worst, any failure by [the doctor] to ... read the nurses' notes .... might constitute negligence, not the requisite deliberate indifference."). Therefore, to the extent that Key is attempting to recover under Section 1983 for this conduct, the court will grant summary judgment in favor of Dr. Sacre. The court, however, expresses no opinion as to whether this failure rises to the level of recklessness, wantonness, or gross negligence to support Key's state law claims.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 12

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

Looking at this evidence in the light most favorable to Key, the court must presume that Dr. Sacre was told and, therefore, knew that Key was taking Klonopin. Furthermore, during his deposition, Dr. Sacre testified that if he had known that Key had been taking Klonopin when she entered the prison, he would have prescribed the medication, or an appropriate substitute, because a failure to do so could result in serious harm to Key (as demonstrated by her delusional state and apparent physical injuries). For these reasons, the court cannot grant summary judgment in favor of Dr. Sacre.

*12 As the Third Circuit has explained, when a physician concludes that medical treatment is required and when the failure to treat can be expected to lead to substantial and unnecessary suffering or injury, the inmate's medical condition is sufficiently serious to give rise to an Eighth Amendment violation. *See Colburn,* 946 F.2d at 1023 (citing *Lanzaro,* 834 F.2d at 347). Here, when the evidence is considered in the light most favorable to Key, Dr. Sacre knew that she was taking Klonopin. He was also aware of the serious withdrawal symptoms associated with this medicine. Nevertheless, he did not prescribe Key any substitute for this medication even though he recognized the need to do so and later saw that her condition was seriously deteriorating.

Most notably, Key appears to have spent weeks in a delusional state. During this time, she heard voices and saw people or things that were not there. In addition, she lost control of her bodily functions and was repeatedly found playing with the water in the toilet. Furthermore, she seems to have injured herself on at least two separate occasions. It appears to be undisputed (at least for the purposes of the pending motions) that this behavior was caused by Key's Klonopin withdrawal. When the record is viewed in this light, a reasonable jury could conclude that Dr. Sacre caused Key's injuries by consciously disregarding the substantial risk posed by Key's reliance on Klonopin.

In response, Dr. Sacre claims that he was not deliberately indifferent to Key's medical condition because he was providing her with treatment and, thus, could not have possibly intended to harm her. However, as the Supreme Court has explained, "[a]n express intent to inflict unnecessary pain is not required" to support an Eighth Amendment violation. *See Whitley v. Albers,* 475 U.S. 312, 319 (U.S.1986). Instead, the defendant need only know of and disregard an excessive risk to an inmate's health of safety. *See Farmer,* 511 U.S. at 836-37. Here, as previously explained, Key has carried her burden on these issues. When the record is viewed in the light most favorable to her, a reasonable jury could find that Dr. Sacre knew that Key was taking Klonopin and that the failure to prescribe her an appropriate substitute would lead to substantial and unnecessary suffering in the form of withdrawal. Despite this knowledge, Dr. Sacre failed to prescribe Key a Klonopin substitute, which subsequently caused her severe withdrawal symptoms. Thus, Key has satisfied the four elements of the *Farmer* test. 511 U.S. at 837.

Next, Dr. Sacre contends that he did not act with conscious disregard for Key's medical needs because he simply came to the wrong conclusion about the reason for her condition. In this respect, Dr. Sacre appears to be arguing that he was primarily treating Key for alcohol withdrawal given her history of alcohol abuse. While this diagnosis may have been partially incorrect, Dr. Sacre continues, his mistaken judgment only rises to the level of medical malpractice which fails to amount to a constitutional violation. *See Andrews,* 95 F.Supp.2d at 228 (relying on *White,* 897 F.2d at 110). However, when the record is viewed in the light most favorable to Key, at least two nurses informed Dr. Sacre that Key was also taking Klonopin. Therefore, for the purposes of summary judgment, the court must presume that he was aware of this information yet still failed to prescribe an appropriate substitute. Thus, this case is not like one where a doctor does not review an inmate's chart and, thus, fails to diagnosis a serious medical condition. *Cf. Sanderfer v. Nichols,* 62 F.3d 151, 155 (6th Cir.1995) ("While perhaps in hindsight [the health care worker] should have checked [the plaintiff's] medical history records, her failure to do so is negligence at most."); *accord Stewart,* 174

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.