Not Reported in F.Supp.2d

Page 13

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

F.3d at 534. Instead, when the record is considered in the light most favorable to Key, this case is one where a physician is aware that a patient faces a substantial risk of serious harm if a certain medication is not prescribed yet fails to provide this individual with this medication or an appropriate substitute. *Cf. Dye v. Sheahan,* 1995 WL 109318, at *5 (N.D. Ill. Mar 10, 1995) (concluding that the failure to provide a diabetic prisoner with appropriate meals stated a claim upon which relief could be granted given the serious medical complications which could arise).

***13** Dr. Sacre also contends that he was not deliberately indifferent to Key's medical condition because he was attempting to address the situation through the prescription of other medications. However, as Dr. Sacre concedes, the Vistaril and Desipramine which he prescribed were intended to serve as Prozac substitutes to treat Key's anxiety disorder, not as substitutes for Klonopin. Furthermore, while Dr. Sacre contends that Serax can be used to treat Klonopin withdrawal, it was Dr. Robinson who placed Key on the Serax protocol, not Dr. Sacre. Moreover, this protocol was discontinued upon Key's return from her first stay at the Gander Hill infirmary although it is not clear why.

For these reasons, the court is not able to grant summary judgment in favor of Dr. Sacre on Key's claims concerning his failure to prescribe Klonopin or and appropriate substitute.

Nevertheless, it would appear that Key is also attempting to recover against Dr. Sacre for his use of Trilafon to treat her condition. In particular, Key has pointed out that this course of treatment was not meeting with beneficial results. For example, although Dr. Sacre initially placed Key on the medication, he took her off of it a few days later since it did not appear to be working. When Key's condition did not improve, Dr. Sacre placed her back on the medication, adjusting and re-adjusting the level of her dosage. During this entire time, Key's condition apparently failed to improve. In fact, she continued to hallucinate and experience tremors. In addition, she still tore apart her paper gowns. Also, she apparently injured herself for a second time while Dr. Sacre was experimenting with the medication. Because this course of treatment was not meeting with any success, Key argues, Dr. Sacre should have adopted a different approach.

However, as the Third Circuit explained in *White,* a doctor "may have had valid medical reasons for trying ... treatments that had failed before." 897 F.2d at 110. Although Key claims that Dr. Sacre had no reason to prescribe Trilafon, the record shows that he took this course of action because, in his judgment, the medication might improve Key's condition. Although this judgment may have been mistaken, at most, such a mistake would appear to constitute nothing more than mere negligence or medical malpractice, not a violation of the Eighth Amendment. *See id.* Thus, to the extent that Key is attempting to recover against Dr. Sacre under Section 1983 for his use of Trilafon to treat her medical condition, the court will grant summary judgment in his favor. [FN7]

FN7. Again, the court takes no position on whether this course of treatment amounted to a reckless, wanton, or grossly negligent violation of the standard of care which Dr. Sacre owed to Key.

2. Dr. Thomas.

According to Key, Dr. Thomas was deliberately indifferent to her medical needs because he failed to properly monitor her Prilosec medication. As a result, Key claims, her supply of this medicine ran out. Because she was no longer able to take the medication, Key continues, her stomach lining became increasingly irritated which, ultimately, resulted in gastric bleeding.

***14** However, there is no evidence in the record to indicate that Dr. Thomas was ever informed that Key's supply of Prilosec had run out. Nor is there any evidence to suggest that Dr. Thomas was responsible for monitoring the amount of Prilosec left in Key's supply. In fact, it would seem that this duty belonged to the nursing staff.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A00558000000... 9/6/2005

Not Reported in F.Supp.2d

Page 14

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

Furthermore, even though one of the nurses did note on Key's chart that her supply of Prilosec was "OOS" or "out of stock," any failure by Dr. Thomas to review the chart would appear to have been at most inadvertent. In fact, Key's own medical expert agrees, concluding that "Dr. Thomas was negligent in not providing Prilosec or a substitute from the formulary to treat [her] gastric condition." *See also Stewart,* 174 F.3d at 534 (holding that the failure of a doctor to review the nurses' notes was at most negligent); *Sanderfer,* 62 F.3d at 155 (same). However, negligence or inadvertence cannot serve as the basis for liability under Section 1983. *See Rouse,* 182 F.3d at 197; *Durmer,* 991 F.2d at 67; *Lanzaro,* 834 F.2d at 346. Consequently, the court will grant summary judgment in favor of Dr. Thomas on the constitutional claims which Key has brought against him.

3. Dr. Robinson.

The court will also grant summary judgment in favor of Dr. Robinson on the Section 1983 claim which Key has brought against him. According to Key, Dr. Robinson was deliberately indifferent to her medical needs because he (1) refused to prescribe her Klonopin or an appropriate substitute when she briefly spoke with him at the BWCI infirmary and (2) improperly treated her condition with an "inadequate" Serax protocol.

Dr. Robinson, however, is not a psychiatrist. Therefore, as Key was told by the prison medical staff, he was not authorized to prescribe her psychotropic medications, such as Klonopin. In addition, at the time that she spoke with Dr. Robinson, Key was already under Dr. Sacre's care. Although the course of treatment which this physician prescribed may not have been entirely proper, Dr. Robinson was not in a position to countermand those orders. In short, he cannot be held liable for deferring to the medical judgment of the doctor who was treating Key, especially when he had no reason to either know or suspect that the course of treatment which had been prescribed for her might have been inappropriate. *Cf. Fillebrown v. Zettlemoyer,* 1996 WL 460051, at *3 (E. D.Pa.1996) ("[P]rison administrators and the nursing staff of the prison infirmary cannot be found deliberately indifferent for failing to defer to an inmate's judgment about appropriate diagnostic care when it contradicts the recommendations of the treating physician. Since [the] defendants were entitled to rely upon the recommendations of the treating physician, their conduct did not amount to deliberate indifference.") (citing *Durmer,* 991 F.2d at 64).

Moreover, when Key was admitted to the Gander Hill infirmary, Dr. Robinson administered a Serax protocol based on the correct assessment that Key was suffering from alcohol withdraw. Although Key claims that she should have received a larger dose of this medication given the combined effect of her Klonopin and alcohol withdrawal, the record shows that the Serax protocol which Dr. Robinson approved stabilized her condition. As a result, she was returned to BWCI.

***15** While Key contends that Dr. Robinson should have increased her Serax dosage to compensate for her lack of Klonopin, this physician was only treating Key for alcohol withdrawal. To the extent that he may not have recognized that Key required a Klonopin substitute because she was also experiencing withdrawal from this medication, this failure does not rise to the level of deliberate indifference. *See Steele v. Choi,* 82 F.3d 175, 179 (7th Cir.1996) (explaining that although the doctor "may have been careless" in failing to recognize that he should investigate several possible explanations for the patient's symptoms, that failure amounted to no more than medical malpractice); *cf. Ruvalcaba v. City of Los Angeles,* 167 F.3d 514, 525 (9th Cir.1999) (holding that the failure to take a patient's medical history which led to an inaccurate diagnosis amounted to only negligence).

For these reasons, the court will grant summary judgment in favor of Dr. Robinson on the constitutional claims which Key has brought against him.

4. Nurse Moore.

According to Key, Nurse Moore "exhibited

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A00558000000 9/6/2005

 Not Reported in F.Supp.2d

Page 15

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

deliberate indifference to [her] serious medical needs by telling her that she could not take Klonopin or Prozac while in prison." Nurse Moore's statement, however, was entirely accurate. Pursuant to prison policy, Key was not allowed to take her personal medications unless they had been approved by a prison physician. Here, Dr. Sacre did not authorize Key to take her personal supply of Klonopin or Prozac. Nurse Moore was, therefore, simply carrying out his orders. As one of Key's own experts has explained, nurses "are not able to prescribe ... medication[.] Therefore, even if they were aware that [Key's] signs and symptoms were related to possible [Klonopin] withdrawal, they could not order this medication for [her]."

Furthermore, Key does not contest Nurse Moore's testimony that she informed Dr. Sacre that Key was taking Klonopin. Thus, it would appear that Nurse Moore not only recognized the risks associated with an abrupt cessation of the medication but also attempted to address these risks by informing the doctor about Key's active Klonopin prescription.

In fact, the only disagreement which Key has with Nurse Moore's conduct is her expert's opinion that the initial intake interview should have been performed by a Registered Nurse (R.N.) instead of a Licensed Practical Nurse (L.P.N.) such as Nurse Moore. However, there is no evidence that Nurse Moore acted improperly in any way when she took Key's medical history. Thus, it is not at all clear how Nurse Moore's status as an L.P.N. caused any of Key's injuries.

Given her conduct, no reasonable jury could conclude that Nurse Moore was deliberately indifferent to Key's medical condition. Nor could any reasonable jury conclude that any of Key's injuries were caused by Nurse Moore's actions. Instead, the evidence plainly shows that Nurse Moore informed Dr. Sacre of Key's medical needs. Although Dr. Sacre may not have properly responded to the situation, Nurse Moore cannot be faulted for his actions. Consequently, the court will grant summary judgment in her favor on Key's constitutional claims. *See Farmer,* 511 U.S. at 837 (explaining that the defendant must disregard the substantial risk of serious harm which the plaintiff faced).

5. Nurse Long.

***16** The court will grant summary judgment in favor of Nurse Long on Key's Section 1983 claims for the same reason. According to Key, this nurse was deliberately indifferent to her serious medical needs because she failed to ensure that Dr. Sacre followed the recommendation made by Key's personal physician to prescribe an appropriate Klonopin substitute.

Nurse Long, however, has testified that she informed Dr. Sacre about her conversation with Key's private doctor, including his recommendation to prescribe Ativan or another appropriate Klonopin substitute. Again, Key has not disputed this version of events. Moreover, it is undisputed that Nurse Long could not approve Key's personal supply of Klonopin for her use or prescribe an appropriate substitute for the medication. Thus, it is not at all clear how Nurse Long actually "fail[ed] to ensure" that the recommendation of Key's personal physician would not be followed.

Instead, the record demonstrates that, like Nurse Moore, Nurse Long properly responded to Key's condition by informing Dr. Sacre about the situation. Although the doctor may not have acted on this advice, Nurse Long cannot be held accountable for his conduct. For these reasons, the court will grant summary judgment in her favor on Key's constitutional claims. *See Farmer,* 511 U.S. at 837 (noting that the defendant must actually disregard the risk facing the plaintiff).

6. Nurse Evans.

The court will further grant summary judgment in favor of Nurse Evans on Key's federal claims. Key is attempting to hold this nurse liable because she told Key that she could be "locked down" if she did not stop asking one of the prison doctors about her prescription medication.

At the time, Key had arrived at the BWCI

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A00558000000... 9/6/2005

Not Reported in F.Supp.2d

Page 16

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

infirmary claiming to need eye drops. She, however, immediately changed the topic of conversation to her prescription medications. Nurse Evans then explained to Key that she could not receive Prozac because it was not contained within the prison formulary. Nor had her personal supply been approved by Dr. Sacre.

Dissatisfied with this answer, Key began speaking with Dr. Robinson who was standing in the hallway. In response, Nurse Evans told Key that this physician could not prescribe her any psychotropic medication because he was not a psychiatrist. Nevertheless, Key resumed her attempt to speak with the doctor as soon as Nurse Evans turned to walk away. At this point in time, the nurse issued her warning about having Key "locked down" if she did not stop her inappropriate behavior.

Based on this record, no reasonable jury could conclude that Nurse Evans was deliberately indifferent to Key's medical needs. First, there is no evidence that Nurse Evans was aware that Key was taking Klonopin. The record, in fact, clearly demonstrates that Key arrived at the infirmary that day to discuss her Prozac prescription. Second, even if Nurse Evans was aware that Key had been taking Klonopin prior to her incarceration, there is no evidence to indicate that she knew that Dr. Sacre had not prescribed an appropriate substitute. Moreover, at the time, Key did not appear to be suffering from any of the effects associated with Klonopin withdrawal. She was not incoherent or delusional. Thus, there was no reason for Nurse Evans to suspect that Key was facing a substantial risk of serious harm.

*17 In short, Nurse Evans simply prevented Key from speaking to a doctor who was not authorized to prescribe her the medications which she desired. Without any indication that Key was facing a substantial risk of serious harm when she entered the prison infirmary that day, no reasonable jury could conclude that Nurse Evans exhibited deliberate indifference for Key's medical needs.

In addition, although Nurse Evans declined to page Dr. Sacre to discuss Key's behavior, Key was not exhibiting any symptoms which would have led to the conclusion that she faced a substantial risk of serious harm. In fact, by arriving at the infirmary under the pretense of requesting eye drops and, then, attempting to speak with Dr. Robinson to obtain her personal medications, Key was exhibiting drug-seeking behavior. There is no evidence in the record to suggest that this type of conduct would or should have placed Nurse Evans on notice that Key might be facing a substantial risk of serious harm.

As a result, the court will grant summary judgment in favor of Nurse Evans on Key's constitutional claims. *See Farmer,* 511 U.S. at 837 (explaining that the defendant must not only be aware of sufficient facts that would give rise to an inference that the plaintiff faced a substantial risk of serious harm but also draw this inference).

7. Nurse Auld.

The court will also grant summary judgment in favor of Nurse Auld on Key's federal claims. This nurse assessed Key as possibly suffering from alcohol withdrawal upon her admission to the Gander Hill infirmary. As a result, Dr. Robinson approved the administration of a Serax protocol which improved Key's condition.

Like Dr. Robinson, any failure by Nurse Auld to recognize that Key may have also been suffering from Klonopin withdrawal does not rise to the level of deliberate indifference. *Cf. Steele,* 82 F.3d at 179 (concluding that similar conduct amounted to at most negligence); *accord Ruvalcaba,* 167 F.3d at 525. Therefore, the court will grant summary judgment in her favor on Key's constitutional claims.

8. The remaining medical personnel.

According to Key, "the jury must be allowed to assess the credibility of all the [remaining members of the medical staff] responsible for [her] treatment in order to determine whether a refusal to provide [her] the medical care [that she requested and her personal physician had prescribed] ... was deliberate on their part." On this point, Key claims that "the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A00558000000 9/6/2005

Not Reported in F.Supp.2d

Page 17

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

nursing staff at both [B]WCI and Gander Hill deliberately chose to ignore the fact that she was being deprived of [her] medication." Key also contends that these nurses, social workers, and other medical personnel at these institutions "refus[ed] to respond to [her] deteriorating psychotic condition" and "refus[ed] to make a meaningful review of [her] medical chart." Key also claims that these individuals did not make adequate notations in her chart to describe her condition. These sweeping arguments which cover the conduct of nearly twenty individual defendants fail to carry Key's burden on summary judgment.

a. Nurses Bradley, Jones, Samuels, Hailey-Angelo, Williams, and Brittingham.

***18** For example, Nurse Bradley signed the April 9, 1996 discharge order when Key was transferred from the Gander Hill infirmary back to BWCI. The order explained that Key was "stable, alert, [and] oriented" even though "slight trem [ors were] still noted." The discharge order also directed the medical staff at BWCI to "continue medications as ordered."

This is the only connection which Nurse Bradley has to Key. There is no evidence that Nurse Bradley ever treated (or, for that matter, even saw) Key. Thus, no reasonable jury could conclude that Nurse Bradley was involved in Key's course of treatment. *See, e.g., Rouse,* 182 F.3d at 200 (requiring personal involvement in the alleged misconduct); *accord Hemmings v. Gorczyk,* 134 F.3d 104, 109 n. 4 (2d Cir.1998).

Nor could any reasonable jury conclude that Nurse Bradley's actions constituted deliberate indifference. In short, there is no evidence that Nurse Bradley was aware of any facts that would give rise to an inference that Key was facing a substantial risk of serious harm. There is no evidence that this nurse was aware of Key's active Klonopin prescription. Nor is there any evidence which indicates that this nurse knew that Key was not being provided with Klonopin or an appropriate substitute. Moreover, even if Nurse Bradley should have known that Key was experiencing Klonopin withdrawal based on the symptoms that had been recorded in Key's chart, any failure by Nurse Bradley to reach this conclusion does not amount to deliberate indifference. *See Steele,* 82 F.3d at 179 (explaining that similar conduct rose only to the level of negligence); *accord Ruvalcaba,* 167 F.3d at 525. Thus, the court will grant summary judgment in favor of Nurse Bradley on the Section 1983 claims which Key has brought against her. *See Farmer,* 511 U .S. at 837 (explaining that the defendant must not only be aware of facts that would enable a person to conclude that the plaintiff faced a substantial risk of serious harm but also actually draw this inference)

The court will also grant summary judgment in favor of Nurse Jones on Key's constitutional claims. Pursuant to Dr. Sacre's orders, Nurse Jones administered a dose of Trilafon to Key on one, single occasion. This is the extent of her involvement in treating Key. Again, while Key may take issue with Dr. Sacre's decision to prescribe Trilafon, the record demonstrates that the doctor adopted this course of treatment in an effort to improve Key's condition. Although Dr. Sacre may have mistakenly thought that the use of Trilafon would lead to some improvement, this type of mistake does not give rise to a constitutional violation. *See White,* 897 F.2d at 110. As the court has previously held, Key cannot recover against Dr. Sacre under Section 1983 for his decision to use Trilafon. Thus, she certainly cannot recover against Nurse Jones under the same statute for following Dr. Sacre's orders to administer the medication. *See also Fillebrown,* 1996 WL 460051, at *3 ("[T]he nursing staff ... cannot be found deliberately indifferent for failing to defer to an inmate's judgment about appropriate diagnostic care when it contradicts the recommendations of the treating physician.") (citing *Durmer,* 991 F.2d at 64). Therefore, the court will grant summary judgment in favor of Nurse Jones on Key's federal claims.

***19** The court will further grant summary judgment in favor of Nurse Samuels on Key's Section 1983 claims. This nurse saw Key on two occasions. On April 20th, she noted that Key was tearing apart her paper hospital gowns. Nurse Samuels also noted

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A00558000000 9/6/2005

Not Reported in F.Supp.2d

Page 18

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

that Key was experiencing mild tremors. The following day, Nurse Samuels again observed that Key was continuing to shred her paper gowns. She also saw that Key was continuing to experience tremors. Once again, there is no evidence that Nurse Samuels was aware of any facts that would give rise to an inference that Key was facing a substantial risk of serious harm. Nor is there any evidence that Nurse Samuels actually drew that inference. Given the evidence, it does not appear that Nurse Samuels knew that Key had been taking Klonopin prior to her incarceration. Nor does it appear as if she knew that Dr. Sacre had failed to prescribe Klonopin or an appropriate substitute. In addition, any failure by Nurse Samuels to realize that Key might be experiencing Klonopin withdrawal based on the symptoms that she was exhibiting does not rise to the level of deliberate indifference necessary to sustain a finding of liability under Section 1983. *See Steele,* 82 F.3d at 179; *accord Ruvalcaba,* 167 F.3d at 525. Furthermore, Nurse Samuels was involved with Key's treatment after her bruises had been noted by other members of the nursing staff on April 16th and 19th. In other words, Nurse Samuels could not have taken any steps to prevent injuries which had already occurred. For these reasons, the court will grant summary judgment in favor of Nurse Samuels on Key's constitutional claims.

Like Nurse Samuels, Nurse Hailey-Angelo saw Key on only two occasions. On April 23rd, she noted that Key was hallucinating and experiencing a "flight of ideas." The following day, she apparently observed that Key's condition had slightly improved. Key was awake during the entire shift and did not voice any complaints. Again, there is no evidence that Nurse Hailey-Angelo was aware of any facts that would give rise to an inference that Key faced a substantial risk of serious harm. Like the other nurses which the court has discussed, Nurse Hailey-Angelo does not appear to have known that Key was taking Klonopin prior to her incarceration. Nor does it appear that Nurse Hailey-Angelo knew that Dr. Sacre had failed to provide Key with this medication or an appropriate substitute. Likewise, any failure by Nurse Hailey-Angelo to recognize that Key might be suffering from Klonopin withdrawal based on the symptoms that she was exhibiting does not rise to the level of deliberate indifference. *See Steele,* 82 F.3d at 179; *Ruvalcaba,* 167 F.3d at 525. Furthermore, like Nurse Samuels, Nurse Hailey-Angelo became involved with Key's treatment after she began exhibiting bruises. Thus, she could not have prevented any injuries which had already occurred. Consequently, no reasonable jury could find that Nurse Hailey-Angelo was deliberately indifferent to Key's serious medical needs. The court will, therefore, grant summary judgment in her favor on Key's federal claims.

***20** Nurse Williams also saw Key on a limited number of occasions. She signed one of Key's April 9th discharge orders with the recommendation to "avoid alcohol." Nurse Williams next saw Key on April 13th after she had returned to Gander Hill. At the time, Key was sitting on the floor in her cell, shaking. Based on this observation, Nurse Williams believed that Key was experiencing the DT's or delirium tremens, which is a symptom of alcohol withdrawal. On April 15th, Nurse Williams noted that Key was tearing apart her paper hospital gowns, urinating on the floor, and playing with the water in her toilet. Two days later, after Key's condition had improved somewhat, Nurse Williams simply noted that Key remained confused and disoriented.

Given this evidence, no reasonable jury could conclude that Nurse Williams was deliberately indifferent to Key's serious medical needs. Like Nurse Bradley, there is no evidence that Nurse Williams even came into contact with Key during her first stay at the Gander Hill infirmary. Consequently, to the extent that Key is seeking to recover against this nurse under Section 1983 for her signing of the first April 9th discharge order, summary judgment will be granted in her favor. *See Rouse,* 182 F.3d at 200 (requiring personal involvement in the alleged misconduct); *accord Hemmings,* 134 F.3d at 109 n. 4. In addition, although Nurse Williams may have failed to recognize that Key might have also been experiencing Klonopin withdrawal, this failure does not rise to the level of deliberate indifference necessary to sustain a finding of liability under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A00558000000 9/6/2005

Not Reported in F.Supp.2d

Page 19

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

Section 1983. *See Steele,* 82 F.3d at 179 (holding that although careless, a failure to investigate all of the possible causes of a patient's symptoms amounted to only negligence); *cf. Ruvalcaba,* 167 F.3d at 525 (explaining that the failure to take a full medical history which led to a misdiagnosis was only negligent). At a minimum, there is no evidence that Nurse Williams was aware that Key had been taking Klonopin prior to her incarceration. Nor is there any evidence that she was aware that Dr. Sacre had failed to prescribe an appropriate substitute to Key. For these reasons, the court will grant summary judgment in her favor on Key's federal claims.

The court will also grant summary judgment in favor of Nurse Brittingham on Key's Section 1983 claims. This nurse observed Key on four occasions. On April 14th, she noted that Key was lying naked on the floor of the cell. On April 17th, after Key complained that she could not see, Nurse Brittingham conducted an eye exam and found that Key was able to make positive eye contact. During the examination, Nurse Brittingham noted that Key was experiencing tremors in her arms. The following day, Nurse Brittingham conducted another eye exam. Again, she noted that Key could make positive eye contact. Nurse Brittingham also noted that Key was continuing to experience tremors. One week later, this nurse saw that Key was disoriented and unsteady on her feet. Shortly thereafter, Key was transferred to Riverside Hospital.

*21 Based on this evidence, no reasonable jury could conclude that Nurse Brittingham was deliberately indifferent to Key's medical condition. While Nurse Brittingham may not have realized that Key was experiencing Klonopin withdrawal, this failure again does not rise to the level of deliberate indifference. *See Steele,* 82 F.3d at 179; *see also Ruvalcaba,* 167 F.3d at 525. Also, there is no evidence that this nurse was aware that Key had been taking Klonopin prior to her incarceration. Nor is there any evidence that she was aware that Dr. Sacre had failed to prescribe an appropriate substitute to Key. Thus, no reasonable jury could conclude that Nurse Brittingham was aware of sufficient facts which would have enabled her to infer that Key was facing a substantial risk of serious harm. Nor could any reasonable jury conclude that Nurse Brittingham actually drew this inference. Consequently, the court will grant summary judgment in her favor on Key's federal claims. *See Farmer,* 511 U.S. at 837.

b. Nurses Koston, Panichelli, Hill, Booz, and Lewis.

Nurse Koston saw Key on a limited number of occasions. On April 14th, she examined Key and concluded that she might be suffering from depression. On April 18th, as Nurse Koston was taking Key's vital signs, she could not convince her that Dr. Sacre had recently taken her off of Trilafon. On April 21st, 23rd, and 24th, the nurse noted that Key was continuing to hallucinate.

To the extent that Key is attempting to hold Nurse Koston liable under Section 1983 because she diagnosed Key's condition as depression instead of Klonopin withdrawal, this conduct does not rise to the level of deliberate indifference necessary to justify the imposition of liability under Section 1983. *See Steele,* 82 F .3d at 179 (finding similar conduct to be at most negligent); *see also Ruvalcaba,* 167 F.3d at 525 (same).

To the extent that Key is attempting to hold Nurse Koston liable under Section 1983 for Dr. Sacre's decision to prescribe Trilafon, the court will grant summary judgment in the nurse's favor. Like Nurse Jones, Nurse Koston was only following Dr. Sacre's orders when it came to the use of this medication. Because the doctor cannot be held liable for his decision to use the drug, *see White,* 897 F.2d at 110, Nurse Koston certainly cannot be held responsible for following his orders concerning this course of treatment. *See Fillebrown,* 1996 WL 460051, at *3 ("[T]he nursing staff ... cannot be found deliberately indifferent for failing to defer to an inmate's judgment about appropriate diagnostic care when it contradicts the recommendations of the treating physician.").

Moreover, to the extent that Key is attempting to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A00558000000 9/6/2005

hold Nurse Koston liable for failing to provide more detail when she documented Key's condition in her progress notes, Key has completely failed to explain how a more thorough description of her behavior led to her continued suffering. For example, Key has not argued that additional details would have enabled her doctors to recognize that she was suffering from Klonopin withdrawal. In fact, Key does not even contend that Nurse Koston was making a deliberate attempt to be vague in order to delay or deny her treatment. Thus, it seems that any failure to provide a more specific description of Key's behavior would have been at most negligent. As a result, this conduct cannot provide the basis for liability under Section 1983. *See Rouse,* 182 F.3d at 197; *Durmer,* 991 F.2d at 67; *Lanzaro,* 834 F.2d at 346.

*22 For these reasons, the court will grant summary judgment in favor of Nurse Koston on Key's federal claims.

The court will also grant summary judgment on Key's constitutional claims against Nurse Panichelli. On April 6th and 8th, this nurse took Key's vital signs. She also noted that Key told her that she wanted to leave Gander Hill. Between April 15th and 18th, Nurse Panichelli noted that Key was refusing to wear her paper hospital gowns. Instead, she would tear them apart. Nurse Panichelli also observed Key urinate on the floor and play with the water in her toilet during this time. On April 23rd and 24th, Nurse Panichelli noted that although Key was still hallucinating and exhibiting mild tremors, her condition had improved somewhat.

Like Nurse Koston, Key is attempting to hold Nurse Panichelli liable for her failure to provide more detail when she documented Key's condition in her progress notes. Key, however, has failed to explain how a more thorough description of her behavior led to her continued suffering. In addition, the court notes that Key has not claimed that Nurse Panichelli was making a deliberate attempt to be vague in order to delay or deny her treatment. Given the evidence, it would appear that any failure by Nurse Panichelli to provide a more specific description of Key's behavior was at most negligent. Consequently, the court will grant summary judgment in favor of this nurse on Key's constitutional claims. *Rouse,* 182 F.3d at 197 (explaining that a defendant cannot be held liable under Section 1983 for negligent conduct); *Durmer,* 991 F.2d at 67 (same); *Lanzaro,* 834 F.2d at 346 (same).

Like many of the other nurses on the prison staff, Nurse Hill appears to have observed Key on only one occasion. In particular, on April 19th, Nurse Hill watched Key as she slept through the night shift. Nurse Hill also noticed that Key had scattered bruises on her face, arms, and legs. The nurse noted her observations in Key's progress notes. She also informed the nurses on the next shift about the situation. Although Nurse Hill did not bring the matter to the attention of a physician, she testified that the doctors were already aware of Key's condition.

Given this evidence, no reasonable jury could conclude that Nurse Hill was deliberately indifferent to Key's medical needs. At the time that Nurse Hill made her observations, Key appeared to be sleeping. Thus, even though she might have injured herself on an earlier occasion, she was not a danger to herself at the time that Nurse Hill was watching her. Furthermore, Nurse Hill apparently recognized that Key might pose a threat to herself since she made a notation of Key's bruises and passed her concerns on to the nurses on the next shift. Furthermore, as Nurse Hill testified, the doctors were already aware of the situation. Thus, instead of disregarding Key's medical needs, it seems as if Nurse Hill was responding directly to them. Furthermore, there is no evidence in the record to suggest that her response was improper. At a minimum, Key has not provided any argument concerning what this nurse should have done differently. As a result, the court will grant summary judgment in favor of Nurse Hill on Key's federal claims.

*23 The same holds true for Nurse Booz. Like some of the other nurses on staff, she observed Key tearing apart her paper gowns, urinating on the floor, and playing with the water in her toilet.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 21
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

Although one of Key's experts has opined that the failure to better document this conduct breached the duty of care which Nurse Booz owed to Key, there is no indication how this breach caused Key's injuries. For example, Key has not argued that a more detailed description of her behavior would have enabled her doctors to recognize that she was suffering from Klonopin withdrawal. In addition, even if Key had advanced this argument, there is no evidence in the record to support it. Moreover, there is no evidence in the record to suggest that Nurse Booz knew that Key had been taking Klonopin prior to her incarceration. Thus, it does not seem as if she was in possession of sufficient information to conclude that Key may have actually been experiencing Klonopin withdrawal. And, as previously explained, the failure to make this diagnosis based on incomplete information does not rise to the level of deliberate indifference necessary to sustain a finding of liability under Section 1983. *See Steele,* 82 F.3d at 179; *see also Ruvalcaba,* 167 F.3d at 525.

Furthermore, even though Nurse Booz seems to have observed Key hitting herself on one occasion, Key has not argued that the nurse should have intervened to put a stop to this self-destructive behavior. In fact, Key appears to concede that Nurse Booz acted properly by not entering the cell since there apparently were not any correctional officers available to provide a security escort. *Cf. Whitley,* 475 U.S. at 320-22 (explaining that when a defendant acts in response to a threat to institutional security, the court must ask whether the force which used by the defendant "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm"). Admittedly, this case is slightly different from *Whitley* because Nurse Booz was not using force in response to a dangerous situation. Instead, Nurse Booz was refraining from becoming involved in the situation because of the danger which Key posed to the safety of others and, in particular, to the nurse herself.

Given the record, it is clear that, based on her observations, Nurse Booz concluded that Key was not only a danger to herself but also to others. Thus, if Nurse Booz had entered Key's cell alone, she risked injury to herself. In this respect, her failure to intervene was understandable. At a minimum, Key has not argued that Nurse Booz acted unreasonably or with the wanton intent to let Key injure herself. *See id.* at 322 ("Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain ... the case should not go to the jury.").

In addition, at the end of her shift, Nurse Booz told the new staff what had transpired. As Nurse Hill testified, it seems that the doctors were also informed about the situation. Thus, even though Nurse Booz may not have intervened to stop Key from harming herself, she did make Key's self-destructive tendencies known to the medical staff. In this respect, she was not ignoring the threat which Key seems to have posed to herself.

***24** For these reasons, no reasonable jury could conclude that Nurse Booz was deliberately indifferent to Key's medical condition. Consequently, the court will grant summary judgment in her favor on Key's federal claims.

The court will grant summary judgment in favor of Nurse Lewis for similar reasons. This nurse was involved with Key's treatment on two occasions.

On April 6th, Nurse Lewis concluded that Key was probably suffering from alcohol withdrawal because she was hallucinating and experiencing tremors. Although this conclusion may not have been entirely correct, Nurse Lewis' failure to realize that Key may have also been experiencing Klonopin withdrawal does not rise to the level of deliberate indifference. *See Steele,* 82 F.3d at 179 (finding that similar conduct was at most negligent); *see also Ruvalcaba,* 167 F.3d at 525 (same). At a minimum, it does not seem as if Nurse Lewis knew that Key had been taking Klonopin prior to her incarceration. Likewise, it does not appear that she was aware that Dr. Sacre had failed to prescribe an appropriate substitute. Thus, there is no evidence in the record indicating that Nurse Lewis was aware of sufficient facts that would have enabled her to conclude that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A00558000000 9/6/2005

Not Reported in F.Supp.2d

Page 22

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

Key was facing a substantial risk of serious harm. Nor is there any evidence in the record to suggest that Nurse Lewis actually drew this inference.

On April 26th, after Nurse Lewis was informed that Key was bleeding from her scalp, she cleaned and treated the wound. There is no indication how or when Key injured herself. Furthermore, Key has not argued that any of the members of the medical staff should have taken additional precautions, such as placing her in restraints or checking on her more frequently, in order to prevent her from injuring herself. Thus, Key apparently concedes that the treatment she received from Nurse Lewis was proper.

Given this record, no reasonable jury could conclude that Nurse Lewis was deliberately indifferent to Key's medical needs. Although she may not have realized that Key was experiencing Klonopin withdrawal during the April 6th exam, this failure cannot support a finding of deliberate indifference. *See Steele,* 82 F.3d at 179; *see also Ruvalcaba,* 167 F.3d at 525. Furthermore, after Key injured herself, Nurse Lewis treated the wound. There is nothing in the record to suggest that her response was in any way improper. Nor has Key argued that Nurse Lewis should have prevented this injury from occurring by taking the proactive step of placing Key in restraints. For these reasons, the court will grant summary judgment in favor of this nurse on Key's Section 1983 claims.

c. Key's expert testimony.

In short, it appears that Key is attempting to hold all of the nurses liable because they failed to recognize that she might be experiencing Klonopin, as opposed to alcohol, withdrawal and because they failed to describe her symptoms more thoroughly when they made their notations in her chart. Even if "the nurses should have been aware of the signs and symptoms of Klonopin withdrawal and been more comprehensive in their assessment" of Key's condition, any failure by the nursing staff to conclude that Key was actually suffering from Klonopin withdrawal does not constitute deliberate indifference. *See Steele,* 82 F.3d at 179; *see also Ruvalcaba,* 167 F.3d at 525. In addition, although a few notations in Key's chart simply state that she was acting "bizarre" without specifically describing her conduct, there is no indication that the failure to provide a more thorough explanation of Key's behavior contributed to the failure of the prison doctors to properly diagnose her condition. Even if there were a causal connection between the two, any failure to provide more detail about the exact behavior that Key was exhibiting would seem to have been at most negligent. There is certainly no evidence in the record to suggest that any of the members of the medical staff were being deliberately vague in an attempt to delay a diagnosis and, thus, prolong Key's suffering. Nor is there any evidence that these individuals would have or even should have recognized that the failure to provide greater specificity might delay the ultimate diagnosis.

***25** Finally, although Key contends that the members of the medical staff were "refusing to respond to [her] rapidly deteriorating medical condition," the record clearly shows that these individuals constantly monitored Key's situation. Although the nurses may not have been able to cure Key's Klonopin withdrawal, they cannot be held responsible for a doctor's failure to prescribe this medication or an appropriate substitute. Moreover, the record plainly shows that the treatment which the nurses provided was generally at the instruction of a physician. They administered the medications which the doctors prescribed. They monitored Key's condition while she was on full suicide status and close psychiatric observation. They also responded to the concerns that she voiced. For example, Key was examined when she thought that she might be swallowing her tongue. She was also examined when she claimed that she could not see. While they may not have been able to prevent Key from injuring herself on a limited number of occasions, Key has not argued that the nursing staff should have placed her in restraints or taken any other proactive measures to reduce the possibility that she would harm herself.

d. Key's constitutional claim concerning the failure to renew her supply of Prilosec.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A00558000000... 9/6/2005

Not Reported in F.Supp.2d

Page 23

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

In one sentence in her brief, Key seeks to hold seventeen separate defendants liable for "refusing to continue the administration of Prilosec" to her. Only one of these individuals could arguably be charged with any knowledge that Key's supply of Prilosec was out of stock. In particular, Nurse Panichelli's signature appears at the bottom of a medical chart which indicates that the medication was "OOS" on April 14th and 15th. [FN8] However, there is no evidence as to when Nurse Panichelli signed this document. As a result, the court can only speculate as to whether she actually knew that Key's supply of Prilosec had run out.

FN8. Although the signatures of other nurses who have been named as defendants do appear on this chart, Key has not argued that they should be held liable for "refusing to continue the administration of Prilosec" to her. For example, Key has only argued that Nurse Moore should be held liable under Section 1983 because she told her (Key) that "she could not take Klonopin or Prozac while in prison." Likewise, Key has only claimed that Nurse Evans "showed deliberate indifference by threatening to punish [her] for requesting assistance from medical personnel." As this court stated on another occasion, it is not obligated to raise arguments on behalf of parties who are represented by counsel. *See Joint Stock Soc'y v. UDV N. Am.*, 104 F.Supp.2d 390, 401 (D.Del.2000) (citing *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir.1993); *Burdett v. Miller*, 957 F.2d 1375, 1380 (7th Cir.1992)). Thus, to the extent that Key intended to assert Section 1983 claims against Nurse Moore and Nurse Evans for any failure on their part to ensure that Key's Prilosec prescription was renewed, the court deems these claims abandoned. Even if Key has not abandoned these claims, it is still appropriate to grant summary judgment in favor of Nurse Moore and Nurse Evans.
As explained in the body of the court's opinion, any failure to personally inform a doctor that Key had run out of Prilosec would appear to have been at most inadvertent or negligent. At a minimum, there is no evidence that either Nurse Moore or Nurse Evans deliberately withheld this information to prolong Key's suffering, especially since her medical chart plainly stated that the medication was "OOS" or "out of stock."

Key cannot survive summary judgment because there might be some degree of metaphysical doubt concerning this issue. *See Abraham v. Raso,* 183 F.3d 279, 287 (3d Cir.1999) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, (1986)); *Boyle v. County of Allegheny,* 139 F.3d 386, 393 (3d Cir.1998) (same). Instead, Key must establish that there is a genuine issue for trial by demonstrating that a reasonable jury could find in her favor. *See Abraham,* 183 F.3d at 287; *see also Boyle,* 139 F.3d at 393 ("[I]f the evidence is merely colorable or not significantly probative, summary judgment should be granted.") (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994)). Here, with the exception of the medical chart, Key has failed to introduce any evidence concerning whether Nurse Panichelli knew that Key's supply of Prilosec had been depleted. Because there is no additional evidence indicating that Nurse Panichelli was aware that Key's prescription had run out, the court cannot reasonably conclude that this nurse was aware of the situation on or after April 14th.

***26** Furthermore, even if Nurse Panichelli was aware that Key's supply of Prilosec had been depleted, as a nurse, she could not refill this prescription. Instead, she could only inform a doctor of the situation. While Key seems to be arguing that the failure to personally inform a physician about the depleted Prilosec amounted to a conscious disregard for her serious medical condition, this failure seems to have been at most inadvertent and, therefore, negligent. At a minimum, the information was clearly noted on Key's chart. Thus, the nursing staff was not trying to conceal it.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=A00558000000... 9/6/2005