Not Reported in F.Supp.2d                                                                                          Page 24
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

For these reasons, the court will grant summary judgment in favor of the defendants on Key's Section 1983 claim concerning the failure to refill her Prilosec prescription.

e. The members of the Mental Health Unit.

Dr. Boston, the clinical psychologist who serves as Director of the Mental Health Unit, saw Key on one occasion. In particular, on April 26th, she observed Key sitting on the floor of her cell. Key was naked. She was also rambling and incoherent. Furthermore, she was shaking uncontrollably. Based on these observations, Dr. Boston spoke with Dr. Sacre and recommended that Key be transferred to Riverside Hospital so that she could be stabilized.

Given the evidence, no reasonable jury could conclude that Dr. Boston acted with conscious disregard for Key' serious medical needs or substantially departed from accepted professional judgment, practice, or standards. *See Farmer,* 511 U.S. at 837; *see also Shaw by Strain v. Strackhouse,* 920 F.2d 1135, 1145 (3d Cir.1990). Based on Dr. Boston's recommendation, Key was transferred to Riverside hospital and stabilized. Indeed, her Klonopin withdrawal was finally diagnosed. Furthermore, as previously explained, Dr. Boston is a clinical psychologist. She is not a medical doctor or a psychiatrist. Thus, it does not appear as if she would have been qualified to diagnose Key's medical condition. In fact, Key has not introduced any evidence which would tend to show that, in light of her training, Dr. Boston was even capable of reaching the conclusion that Key was suffering from Klonopin withdrawal. Thus, no reasonable jury could conclude that Dr. Boston was deliberately indifferent to Key's condition. As a result, the court will grant summary judgment in the doctor's favor on Key's constitutional claims.

Nye, a social worker, also spoke with Key on one occasion. In particular, after Key stabbed herself in the arm with a plastic fork, Nye met with her to discuss the event. During their conversation, Key told Nye that she could hear "Gary's voice" and that Gary was laughing at her. Key also refused to open her eyes during their conversation. In light of what she had seen, Nye recommended that Key be transferred to Gander Hill for observation. Dr. Sacre apparently concurred. He signed the transfer order that day.

Given this evidence, no reasonable jury could conclude that Nye was deliberately indifferent to Key's medical needs. Again, there is no evidence that, as a social worker, she possessed the requisite training or experience that would have enabled her to diagnose Key's medical condition. In fact, there is no evidence to suggest that Nye should have even recognized that Key's condition was caused by a medical problem. Moreover, in response to Key's condition, Nye recommended that she be transferred to a facility where she could be more closely monitored by medical personnel. Although these individuals may have been unable to recognize that Key was suffering from Klonopin withdrawal, Nye cannot be held liable for their actions. *See Rouse,* 182 F.3d at 200 (requiring personal involvement in the alleged misconduct); *accord Hemmings,* 134 F.3d at 109 n. 4. Therefore, the court will grant summary judgment in favor of Nye on Key's federal claims.

*27 Both McLaughlin and Desmond saw Key a total of three times each during her period of incarceration.

On April 5th, after Key had been jogging outside of BWCI, McLaughlin spoke with Key. He noted that she was confused and disoriented. He suspected that she was experiencing alcohol and prescription drug withdrawal. He, therefore, recommended that the medical staff continue to monitor her condition. On April 16th, after Key was transferred to Gander Hill, McLaughlin noted that her hygiene was "poor" and that her cell was "messy." At this time, Key was experiencing delusions and tremors. She was constantly disrobing and playing with the water in her toilet. McLaughlin, however, did not know the reason for this behavior. One week later, McLaughlin saw Key for the last time. Although she was still exhibiting mild tremors and experiencing a flight of ideas, she was no longer in the extreme delusional state which McLaughlin had previously observed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 25
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

Based on this evidence, no reasonable jury could conclude that McLaughlin was deliberately indifferent to Key's medical needs. Like his colleagues, McLaughlin is not a doctor. Thus, it would seem that he was not qualified to diagnose Key's condition. At a minimum, Key has not introduced any evidence which would tend to show that, in light of his training and experience, McLaughlin should have concluded that Key was suffering from Klonopin withdrawal or appreciated the serious effects that would accompany this withdrawal. In this respect, any failure by McLaughlin to diagnose Key's condition does not rise to the level of deliberate indifference necessary to support a finding of liability under Section 1983. *Cf. Steele,* 82 F.3d at 179 (explaining that while a doctor "may have been careless" by failing to investigate different possible causes for the patient's symptoms, that failure amounted to no more than medical malpractice). Moreover, in apparent recognition of his limitations, McLaughlin recommended to the medical staff that they continue to monitor Key. McLaughlin made this recommendation on the first day that he saw her. Although it seems the medical personnel was unable to recognize that Key was experiencing Klonopin withdrawal, McLaughlin cannot be held liable for their actions. *See Rouse,* 182 F.3d at 200; *accord Hemmings,* 134 F.3d at 109 n. 4.

The same holds true for Desmond. He observed Key on April 18th and 19th. At the time, he noted that she was continuing to hallucinate. She was also experiencing tremors. Desmond then informed Dr. Sacre about his observations. As a result, the doctor apparently resumed treating Key with Trilafon. In addition, because Key no longer appeared to be suffering from suicidal ideation, Desmond recommended taking her off of full suicide status and placing her on psychiatric close observation. Dr. Sacre concurred. Desmond last observed Key on April 24th. She still seemed confused claimed that her son had visited her. As a result, Desmond believed that Key was continuing to hallucinate.

*28 Again, based on this evidence, no reasonable jury could conclude that Desmond was deliberately indifferent to Key's medical condition. Like McLaughlin, Desmond is not a doctor. Therefore, he could not prescribe Key Klonopin or an appropriate substitute. Nor does it seem that he would have been able to appreciate the significant problems which a lack of Klonopin would cause. Likewise, any failure by Desmond to recognize that Key might be suffering from Klonopin withdrawal does not constitute deliberate indifference. *Cf. Steele,* 82 F.3d at 179 (finding that similar conduct was only negligent). Furthermore, although Dr. Sacre may have decided to treat Key with Trilafon in response to some of the information that he had received from Desmond, he cannot be held liable for the physician's actions, especially when the doctor himself cannot be held liable under Section 1983 for his decision to use the medication to treat Key's condition.

For these reasons, the court will grant summary judgment in favor of McLaughlin and Desmond on Key's Section 1983 claims.

f. What the court interprets as Key's Rule 56(f) motion.

Finally, in her opposing papers, Key claims that it would be "inappropriate and unfair" to grant summary judgment in favor of at least one member of the medical staff because this individual has not yet been deposed. Although Key does not support her request by citing to any case or rule, the court interprets Key's argument as a motion under Rule 56(f) of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 56(f) (2000) (allowing the court to postpone ruling on summary judgment in order to afford the opposing party sufficient time to take needed discovery).

Rule 56(f) generally requires the party opposing summary judgment to file an affidavit which specifically explains why it requires more time to present facts which would be essential to its case. *See* Fed.R.Civ.P. 56(f) (2000); *see also Annulli v. Panikkar,* 200 F.3d 189, 201 n. 11 (3d Cir.1999) (noting that the failure to file an affidavit is "usually fatal" to a Rule 56(f) motion) (quoting *Pastore v. Bell Tel. Co.,* 24 F.3d 508, 510-11 (3d Cir.1994)). Admittedly, the Third Circuit tends to forgive the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 26
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

requirement for an affidavit as long as the opposing party identifies in its papers: (1) what particular information is being sought; (2) how it will preclude summary judgment; and (3) why it has not previously been obtained. *See St. Surin v. Virgin Islands Daily News, Inc.,* 21 F.3d 1309, 1314 (3d Cir.1994) (quoting *Lunderstadt v. Colafella,* 885 F.2d 66, 71 (3d Cir.1989); *Dowling v. City of Philadelphia,* 855 F.2d 136, 140 (3d Cir.1988)).

Here, Key has only stated that she wishes to depose a particular defendant. She has not identified what information she seeks to obtain from him. Nor has she explained how this information will preclude summary judgment in his favor. Instead, she has only stated that it would be "inappropriate and unfair" to grant summary judgment in favor of this individual because he has not yet been produced for a deposition. This argument completely fails to explain what Key expects to discover by questioning this individual, how this information would apply to her case, and why she could not have obtained this information earlier. *See Pastore,* 24 F.3d at 511. In particular, although Key does identify this individual by name, she does not explain how he was involved in her treatment or how his involvement would prevent the court from entering summary judgment in his favor. Furthermore, Key has provided no explanation as to why she could not have obtained information about this individual from the countless other defendants that she has deposed in this case or, at the very least, through the tools of written discovery. For this reason, Key's Rule 56(f) motion will be denied. The court will, therefore, grant summary judgment in favor of this defendant (as well as any others who have not been deposed to date).

9. CMS.

*29 In passing, the court notes that CMS has not moved for summary judgment on the constitutional claims that Key has brought against it. Nevertheless, Key's theory of liability against this particular defendant is not exactly clear. To the extent that she is attempting to hold this entity liable for the acts of its employees, her claims would fail as a matter of law. *See, e.g., Bagwell v. Brewington-Carr,* No. 97-321, at 20-21 (D.Del. Apr. 27, 2000) (declining to hold Prison Health Services, the successor of CMS, liable for the conduct of its employees since Section 1983 liability cannot be imposed on a *respondeat superior* theory).

Admittedly, Key might be able to recover against CMS if she can show that it engaged in a policy or custom that demonstrates deliberate indifference. *See Miller v. Correctional Medical Sys., Inc.,* 802 F.Supp. 1126, 1130 (D.Del.1992) (relying on *Monell v. Department of Social Services of New York,* 436 U.S. 658, 690-91 (1978)). To the extent that Key is making this type of argument, the only policy or custom at issue in this litigation has been the one which prohibits inmates from bringing their personal medications into a correctional facility unless they have been inspected and approved by a prison doctor. Thus, the procedures would appear to require the medical staff to inform the doctors about the medications which an inmate has brought to the prison.

Given the record, it is not clear whether these procedures also require a physician to provide the inmate with appropriate substitute medications from the prison formulary if their personal medications are confiscated. It seems, however, that this is the custom which has been adopted by the medical personnel. Of course, in this case, it does not appear as if Key was initially provided with a substitute for her Klonopin prescription, however, it also does not appear as if this failure was the result of any prison policy or custom. In fact, it seems that any failure in this regard would have contravened the established custom. Consequently, to the extent that Key is seeking to recover under this theory, the court will require her to show cause why this claim should not be dismissed. To the extent that Key is attempting to recover under a different theory, the court will require her to plainly set forth this theory in her submission.

10. The State Law Claims.

Key has also alleged that all of the medical defendants acted recklessly, wantonly, or with gross negligence in failing to provide her with medical

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 27
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

care. Based on these allegations, Key seeks to recover both compensatory and punitive damages from these individuals.

The degree of recklessness, wantonness, or gross negligence necessary to impose liability under Section 1983 would appear to roughly equate with the same degree of culpability required for the imposition of punitive damages under Delaware law. *Cf. Carrigan v. Delaware,* 957 F.Supp. 1376, 1390 (D.Del.1997) ("Though not identical ... it is clear that the terms "gross negligence" and "wanton conduct" bear some resemblance to the "deliberate indifference" standard that permeates constitutional law.").

*30 As previously explained, in order to recover under Section 1983, an inmate must show that a defendant acted with the "obduracy and wantonness" akin to conduct that includes criminal recklessness or a conscious disregard of a serious risk. *See Rouse,* 182 F.3d at 197; *accord Watson,* 984 F.2d at 540. The terms "wanton" and "reckless disregard for the rights of others" appear to be synonyms. *See Smith,* 461 U.S. at 39-40 n. 8. They both require an awareness of a known or obvious risk. *See, e.g., L.W. v. Grubbs,* 92 F.3d 894, 900 (9th Cir.1996) (explaining that the defendant must have "participated in creating [the] dangerous condition and acted with deliberate indifference to the known or obvious danger"); *accord Barrie v. Grand County,* 119 F.3d 862, 869 (10th Cir.1997) (noting that the defendant must act with deliberate indifference to a known or obvious risk). Furthermore, a finding of gross negligence generally requires a similar degree of conscious awareness, at least if it is going to serve as the basis for an award of punitive damages. *See Carrigan,* 957 F.Supp. at 1390.

As the Delaware Supreme Court explained in *Jardel Co., Inc. v. Hughes,*
> The punishment [and] deterrence rationale underlying punitive damages has caused them to be characterized as civil penalties which serve as a substitute for criminal prosecution for conduct which, though criminal, often goes unpunished by the public prosecutor.

> The penal and public policy considerations which justify the imposition of punitive damages require that they be imposed only after a close examination of whether the defendant's conduct is "outrageous" because of "evil motive" or "reckless indifference to the rights of others." Mere inadvertence, mistake, or errors of judgment which constitute negligence will not suffice. It is not enough that a decision be wrong. It must result from a conscious indifference to the decision's foreseeable effect.
> ... [T]he outrageous conduct may be the result of an evil motive or reckless indifference. In rough approximation, these terms parallel the willful and wanton standard of the guest statute. Each refers to a distinct state of mind, one a conscious awareness, the other a conscious indifference.... [E]ach requires that the defendant foresee that his unacceptable conduct threatens a particular harm to the plaintiff.... Willfulness and wantonness involve an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences, while negligence lacks any intent, actual or constructive.
> ... A reckless state of mind [involves a] conscious disregard of substantial risks ... akin to the intentional infliction of harm....
> ...
> Two significant elements must be present for recklessness to exist. The first is the act itself.... The second, crucial element involves the actor's state of mind and the issue of foreseeability, or the perception the actor had or should have had of the risk of harm which his conduct would create....
> *31 Where the claim of recklessness is based on an error of judgment, a form of passive negligence, the plaintiff's burden is substantial. It must be shown that the precise harm which eventuated must have been reasonably apparent but consciously ignored in the formulation of the judgment.

523 A.2d at 529-31 (citations omitted).

As the Delaware Supreme Court made clear in *Jardel,* a "reckless" state of mind is one which exhibits a "conscious indifference to the rights of others." *Id.* at 530. It is the equivalent of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 28

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

defendant "turn[ing] its back on a known risk." *Id.* at 531. Likewise, "wanton" misconduct involves an actual or constructive awareness of the probable consequences of one's actions. *Id.* at 530. It is equivalent to a "conscious indifference" evincing a complete or utter lack of care for the harm which a person's actions might cause. *See Morris v. Blake,* 552 A.2d, 844, 847-48 (Del.Super.Ct.1988), *aff'd,* 610 A.2d 1354 (Del.1992). In the same vein, "deliberate indifference" requires a "conscious disregard" of a substantial risk of serious harm. *See Farmer,* 511 U.S. at 837. This standard is very similar to the recklessness, wantonness, or gross negligence necessary to support an award of punitive damages under Delaware law. *Cf. Carrigan,* 957 F.Supp. at 1390 (noting that although these terms are not identical, they do bear some resemblance to each other). In fact, as the Supreme Court held in a similar case,

> a jury may be permitted to assess punitive damages in an action under [Section] 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.... [T]his threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness.

*See Smith,* 461 U.S. at 56; *see also Savarese v. Agriss,* 883 F.2d 1194, 1204 (3d Cir.1989) ("[F]or a plaintiff in a Section 1983 case to qualify for a punitive damages award, the defendant's conduct must be at a minimum reckless or callous.") (relying on *Smith* ); *cf.* 42 U.S.C.A. § 1981a(b)(1) (West Supp.2000) (allowing a plaintiff in a federal civil rights action to recover punitive damages against any individual defendant upon a showing of malice or reckless indifference).

Thus, regardless of whether Key is seeking to recover pursuant to Section 1983 under a deliberate indifference theory or whether she is seeking to recover under state law for any reckless, wanton, or grossly negligent misconduct which may have occurred, in order to obtain punitive damages, she must demonstrate that the defendants acted with some degree of reckless or callous indifference. As this court has explained, given the evidence, it would appear that no reasonable jury could conclude that several of the medical defendants acted with this degree of culpability.

a. The nurses.

**\*32** For example, it is not at all clear how Nurse Moore acted recklessly, wantonly, or with gross negligence. As the court has explained, given the record, it would seem that she told Dr. Sacre that Key was taking Klonopin. Although he might not have prescribed an appropriate substitute in response to this information, Key's own expert has explained that nurses cannot prescribe medication. Thus, it is not clear what additional steps Nurse Moore should have taken. For this reason, it is not clear whether Nurse Moore acted negligently (let alone recklessly, wantonly, or with gross negligence). [FN9]

> FN9. In fact, as previously discussed, the only disagreement which Key has with Nurse Moore's conduct is her expert's opinion that the initial intake interview should have been performed by a Registered Nurse (R.N.) instead of a Licensed Practical Nurse (L.P.N.) such as Nurse Moore. However, there is no evidence that Nurse Moore in any way acted improperly when she took Key's medical history. Thus, it is not clear how Nurse Moore caused any of Key's injuries.

Likewise, it is not clear how Nurse Long's conduct rises to the level of recklessness, wantonness, or gross negligence alleged in the complaint. Like Nurse Moore, Nurse Long seems to have informed Dr. Sacre that Key had been taking Klonopin and that her personal physician recommended prescribing her a Klonopin substitute, such as Ativan. Thus, like Nurse Moore, it does not appear as if Nurse Long was even negligent (let alone reckless, wanton, or grossly negligence).

The same holds true for Nurse Evans. She simply told Key that she could be "locked down" if she did not stop asking Dr. Robinson about her prescription medication. It is not clear how this conduct was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reckless, wanton, or grossly negligence. At the time that Nurse Evans made this comment, Key was not exhibiting any of the symptoms associated with Klonopin withdrawal. In fact, it does not even appear that Nurse Evans was aware that Key had been taking Klonopin prior to her incarceration. In this light, it does not even seem that Nurse Evans acted negligently (let alone recklessly, wantonly, or with gross negligence).

Nurse Auld's conduct also appears to have been at most negligent. Upon Key's admission to Gander Hill, this nurse concluded that Key was probably suffering from alcohol withdrawal. Although Nurse Auld may have failed to recognize that Key was probably experiencing Klonopin withdrawal as well, it would seem that this failure was at most negligent. *See Steele,* 82 F.3d at 179; *see also Ruvalcaba,* 167 F.3d at 525.

Similarly, it does not appear as if Nurse Bradley, Nurse Jones, Nurse Samuels, Nurse Hailey-Angelo, Nurse Williams, or Nurse Brittingham engaged in any culpable conduct.

The record indicates that Nurse Bradley never even saw Key. Instead, she merely signed one of her discharge orders. It is not at all clear how this conduct could rise to the level of negligence, not to mention the alleged recklessness, wantonness, or gross negligence alleged by Key. Moreover, there is no indication how Nurse Bradley's conduct caused Key to suffer any injuries.

Nurse Jones seems to have seen Key on only one occasion, when she administered Trilafon pursuant to Dr. Sacre's orders. It would seem that this conduct also fails to rise to the level of negligence.

Nurse Samuels and Nurse Hailey-Angelo saw Key twice. On each occasion, they noted that Key was either tearing apart her hospital gowns, experiencing slight tremors, or hallucinating. Even if these two nurses should have been "much more inclusive in describing [Key's] physical and psychological condition," it is not clear how their failure to be more descriptive caused her injuries. Key was already experiencing Klonopin withdrawal as an apparent result of Dr. Sacre's failure to prescribe an appropriate substitute weeks earlier. In addition, to the extent that Nurse Samuels and Nurse Hailey-Angelo did not recognize that Key might be experiencing Klonopin withdrawal given her symptoms, this failure would appear to have been at most negligence, not reckless, wanton, or grossly negligent. *See Steele,* 82 F.3d at 179; *see also Ruvalcaba,* 167 F.3d at 525.

*33 Like several of her co-workers, Nurse Williams also had a limited involvement with Key. On April 9th, she signed a discharge order which recommended that Key should "avoid alcohol." It is not clear how a reasonable jury could conclude that this behavior was reckless, wanton, or grossly negligent. In fact, there does not appear to be any evidence that this conduct even violated the appropriate standard of care and, thus, amounted to mere negligence. On April 13th, Nurse Williams observed Key was sitting on the floor in her cell, shaking. Based on this observation, Nurse Williams believed that Key was experiencing the DT's or delirium tremens, which is a symptom of alcohol withdrawal. Although this conclusion may not have been entirely accurate since Key may have also been experiencing Klonopin withdrawal, it would seem that any failure to recognize this condition was at most negligent. *See Steele,* 82 F.3d at 179; *see also Ruvalcaba,* 167 F.3d at 525. Moreover, although Nurse Williams observed Key act strangely on two subsequent occasions, it is not clear how the nurse's conduct during these times rose to the level of recklessness, wantonness, or gross negligence alleged in Key's complaint. Furthermore, even if Nurse Williams' failure to more thoroughly document Key's symptoms did rise to this level of culpability, it is not clear how this nurse's behavior caused Key's injuries. By this time, several weeks had passed since Key first entered the prison, and no doctor had diagnosed her as suffering from Klonopin withdrawal. It is not at all clear how a more detailed description of Key's behavior would have accelerated an accurate diagnosis and, thus, expedited the treatment which she ultimately received.

For similar reasons, it does not appear as if a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 30

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

reasonable jury could conclude that Nurse Brittingham acted recklessly, wantonly, or with gross negligence. She observed Key on four occasions. She conducted two eye exams and found that Key was not suffering from any vision problems. She also noted that Key was experiencing tremors. Finally, on the last day which she saw Key, Nurse Brittingham noted that she was disoriented and unsteady on her feet. Shortly thereafter, Key was transferred to Riverside Hospital. Again, it would appear that Key is only attempting to hold Nurse Brittingham liable for failing to better document the behavior which she observed. However, it is not clear how this failure rises to the level of recklessness, wantonness, or gross negligence alleged in Key's complaint. Furthermore, even if this conduct met this heightened standard of culpability, it is not clear how it caused Key's injuries. As previously explained, there is no indication that a failure to provide a more thorough description of Key's symptoms prevented the doctors from treating Key or diagnosing her Klonopin withdrawal.

For the same reasons, it would seem that no reasonable jury could conclude that Nurse Koston acted recklessly, wantonly, or with gross negligence. It would also seem that no reasonable jury could conclude that Nurse Koston's actions caused Key's injuries. As previously explained, Nurse Koston's failure to recognize that Key was suffering from Klonopin withdrawal as opposed to depression seems to have been at most negligent. Likewise, to the extent that Nurse Koston administered Trilafon to Key, she did so pursuant to Dr. Sacre's orders. Thus, it is not clear how Nurse Koston was acting recklessly, wantonly, or with gross negligence in this regard. Furthermore, even if Nurse Koston should have described Key's symptoms more thoroughly, this failure also seems to have been at most negligent. In addition, even if it rose to the level of recklessness, wantonness, or gross negligence alleged in Key's complaint, it is not clear how this conduct actually caused Key's injuries. There is no indication how a more detailed description of Key's behavior would have enabled her doctors to recognize that she was suffering from Klonopin withdrawal.

*34 The same holds true for Nurse Panichelli. Given the evidence, it would appear that any failure by Nurse Panichelli to provide a more specific description of Key's behavior was at most negligent, not reckless, wanton, or grossly negligent. Also, there is no indication how a more thorough description of Key's behavior would have enabled the doctors to diagnose her Klonopin withdrawal more quickly and, thus, end her suffering. Thus, it is not clear how a reasonable jury could return a verdict in favor of Key on these claims.

Likewise, it is not clear how a reasonable jury could return a verdict against Nurse Hill. She observed Key on one occasion. On April 19th, Nurse Hill watched Key as she slept through the night. At the time, Nurse Hill noticed that Key had scattered bruises on her face, arms, and legs. The nurse noted her observations in Key's progress notes. She also informed the nurses on the next shift about the situation. Although Nurse Hill did not bring the matter to the attention of a physician, she testified that the doctors were already aware of Key's condition. Given this evidence, it would seem that no reasonable jury could conclude that Nurse Hill acted recklessly, wantonly, or with gross negligence. Key was not a threat to herself at the time that Nurse Hill made her observations. Furthermore, Nurse Hill apparently recognized that Key might pose a danger to herself because she made a notation of Key's bruises and passed her concerns on to the nurses on the next shift. There does not appear to be any evidence in the record to suggest that her response was improper. At a minimum, Key has not provided any argument concerning what this nurse should have done differently. Thus, it is not clear how (or even if) Nurse Hill breached any standard of care which she owed to Key. Consequently, it is even less clear how Nurse Hill's conduct rises to the level of recklessness, wantonness, or gross negligence alleged in the complaint.

The same holds true for Nurse Booz. She also informed other members of the nursing staff about Key's self-destructive tendencies. Admittedly, unlike Nurse Hill, Nurse Booz seems to have observed Key actually strike herself. However, as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 31

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

(Cite as: 2000 WL 1346688 (D.Del.))

previously explained, it does not appear as if Nurse Hill could have intervened to prevent this self-destructive behavior from occurring without placing her own safety at risk. Thus, it is not clear how Nurse Booz's conduct rises to the level of recklessness, wantonness, or gross negligence alleged in Key's complaint. Furthermore, even if the court were to assume that Nurse Booz should have described Key's withdrawal symptoms in greater detail, it is not clear how the descriptions which she did provide caused Key's injuries. As previously explained, it does not appear as if a more adequate description of Key's behavior would have enabled her doctors to recognize that she was suffering from Klonopin withdrawal. Thus, even if the court were to assume that Nurse Booz acted recklessly, wantonly, or with gross negligence in this regard, it is not clear how a reasonable jury could return a verdict in Key's favor on this claim.

*35 It is also not clear how Nurse Lewis acted recklessly, wantonly, or with gross negligence. Although this nurse may not have recognized that Key was experiencing both Klonopin and alcohol withdrawal, it would seem that this failure was at most negligent, not reckless, wanton, or grossly negligent. Likewise, Key has not claimed that Nurse Lewis should have realized the threat which she (Key) posed to herself. Nor has Key argued that Nurse Lewis should have taken greater precautions in order to protect Key from herself. Thus, it is not clear how Key can recover against Nurse Lewis on the claims of recklessness, wantonness, and gross negligence alleged in the complaint.

b. The members of the Mental Health Unit.

Dr. Boston only saw Key on one occasion. Based on her observations, she recommended that Key be transferred to Riverside Hospital where should could be treated and stabilized. Given this conduct, it does not seem as if a reasonable jury could conclude that Dr. Boston acted recklessly, wantonly, or with gross negligence. In fact, there does not appear to be any evidence in the record which indicates that she even violated the governing standard of care (let alone deviated from it substantially).

Likewise, it is not at all clear how Nye acted recklessly, wantonly, or with gross negligence. She simply recommended that Key be transferred to Gander Hill for closer observation. However, there does not even appear to be any evidence in the record which suggests that these actions violated or departed from the governing standard of care. Furthermore, Nye is a social worker. She does not appear to be a medical professional. Thus, to the extent that she may have failed to diagnose Key's medical condition, it would seem that she could have only been at most negligent.

The same holds true for McLaughlin and Desmond. They are not doctors. Thus, their inability to conclude that Key was suffering from Klonopin withdrawal would also appear to have been at most negligent. With respect to their observations of Key, there is no evidence that their actions violated or deviated from any duty of care which they owed to her. In addition, while Dr. Sacre may have resumed Key's Trilafon treatments based on the information which Desmond provided, it is not clear how he can be held liable for the doctor's actions.

c. Dr. Robinson.

Key appears to be attempting to hold Dr. Robinson liable because he did not prescribe her Klonopin or an appropriate substitute when she briefly spoke with him at the BWCI infirmary. Key also contends that Dr. Robinson acted improperly when he approved of the use of a Serax protocol to treat what he believed was alcohol withdrawal. Apparently, Key believes that Dr. Robinson should have recognized that she might also be suffering from Klonopin withdrawal. As a result, she seems to argue, he should have prescribed Klonopin or an appropriate substitute.

However, as previously explained, Dr. Robinson is not a psychiatrist. Thus, pursuant to prison policy, he does not appear to have been authorized to prescribe her psychotropic medications, such as Klonopin. Furthermore, it is not clear whether Dr. Robinson was in a position to countermand any orders which Dr. Sacre, the treating psychiatrist, had issued. Moreover, even though Dr. Robinson

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                       Page 32
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

may have failed to recognize that Key was also experiencing Klonopin withdrawal, this failure would seem to have been at most negligent. *See Steele,* 82 F.3d at 179; *cf. Ruvalcaba,* 167 F.3d at 525.

*36 For these reasons, it does not appear that Dr. Robinson acted recklessly, wantonly, or with gross negligence. In fact, some of his conduct does not seem to even be actionable as ordinary negligence.

d. Dr. Thomas.

Likewise, Dr. Thomas seems to have been at most negligent in failing to ensure that Key's supply of Prilosec was refilled. Apparently, Dr. Thomas was not informed that Key's supply of this medication had run out. However, any failure by Dr. Thomas to review Key's chart to learn that her Prilosec was out of stock would appear to have been inadvertent or negligent. *See Stewart,* 174 F.3d at 534; *Sanderfer,* 62 F.3d at 155. Thus, this conduct also does not appear to rise to the level of recklessness, wantonness, or gross negligence alleged in the complaint.

e. The court's show cause order.

In summary, given the record, it would appear that a large number of the medical defendants (whether doctors, nurses, or other professionals) did not engage in any culpable conduct. In addition, while some of these individuals may have acted negligently, Key has not sought to recover under this theory. Instead, she has alleged a heightened state of culpability (recklessness, wantonness, and gross negligence) in an apparent attempt to obtain punitive damages. The evidence, however, does not appear to support these allegations.

For these reasons, the court will require Key to show cause why her state law claims against these defendants should not be dismissed. In her submission, Key should specifically address the issues which the court has raised in this opinion on a defendant-by-defendant basis. One sentence arguments which mention upwards to twenty individuals, like those contained in her summary judgment papers, will not suffice. Instead, Key must specifically demonstrate how each one of the medical defendants, with the exception of Dr. Sacre, acted recklessly, wantonly, or in a grossly negligent manner. Key should support her factual statements with specific citations to the record. She should support her legal arguments with citation to established precedent.

In the event that Key seeks to drop her claims of recklessness, wantonness, or gross negligence against these individuals and instead pursue claims of simple negligence or malpractice, the court will entertain a motion to amend. [FN10]

> FN10. The parties may brief this motion on the schedule provided by the local rules, *see* D. Del. L.R. 7.1.2(a) (1995), unless they can agree to an expedited time table. However, the opening and answering briefs shall be limited to five, double-spaced pages each. Key's reply brief shall be limited to three, double-spaced pages.

B. The Prison Officials.

In addition to bringing suit against more than thirty medical personnel, Key has also named four prison officials as defendants in this case. These individuals are Patrick Ryan, Grace Martin, Sherese Brewington-Carr and Raphael Williams. At the time that these events transpired, Ryan and Martin were the Warden and Deputy Warden of BWCI, respectively. Brewington-Carr and Williams were the Warden and Deputy of Warden of Gander Hill, respectively. According to Key, all four of these individuals refused to provide her with proper medical treatment and forced her to remain in conditions where she was exposed to assaults from other prison inmates or correctional officers. In addition, Key claims that Ryan interfered with the course of her medical treatment because, on one occasion, he instructed her to take the medications which Dr. Sacre had prescribed to her.

*37 As the Third Circuit has explained, prison officials violate the Eighth Amendment's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 33
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

prohibition against cruel and unusual punishment when they deny an inmate's reasonable request for medical treatment and, as a result, expose the prisoner to "undue suffering or the threat of tangible residual injury." *See Lanzaro,* 834 F.2d at 346 (citing *Westlake v. Lucas,* 537 F.2d 857, 860 (6th Cir.1976)). For example, if a prison official knows that an inmate requires medical care yet intentionally refuses to provide the prisoner with this treatment, he acts with deliberate indifference to that inmate's serious medical needs. *See id.* (citing *Ancata v. Prison Health Servs.,* 769 F.2d 700, 704 (11th Cir.1985)). In addition, a prison official may not simply elect "an easier and less efficacious" form of treatment simply because it could be administered more quickly or cheaply. *See West v. Keve,* 571 F.2d 158, 162 (3d Cir.1978) (citations omitted). Finally, when a prison official deliberately prevents an inmate from receiving treatment for a serious medical need or when a prison official prohibits an inmate for gaining access to a physician so that his condition can be evaluated, he runs afoul of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir.1979).

However, as all of these examples make clear, in order to be held liable under Section 1983, a prison official must be personally involved in or, at the very least, aware of the alleged misconduct. *See Gay v. Petsock,* 917 F.2d 768, 771 (3d Cir.1990). As the Third Circuit has explained, "liability [under Section 1983] cannot be predicated solely on the operation of *respondeat superior." See Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988). Thus, prison officials cannot be held liable simply because, as administrators, they were generally responsible for the health and safety of the inmates in their custody. *See Bagwell v. Brewington-Carr,* No. 97-321- GMS, slip op. at 22 (D.Del. Apr. 27, 2000) (granting summary judgment in favor the Warden and Deputy Warden of Gander Hill because the plaintiff was literally arguing that, as prison administrators, it was their "job ... to oversee everything at the prison"). Instead, the official must actually participate in the alleged deprivation in some way or, at a minimum, have knowledge about the adverse situation yet allow it to continue. *See Gay,* 917 F.2d at 771; *Rode,* 845 F.2d at 1207.

1. Ryan.

According to Key, Ryan interfered with her medical treatment because he once visited her at the BWCI infirmary and told her that she could not take her personal medications. Ryan, however, visited Key because he had been informed that she was not taking the medications which Dr. Sacre had prescribed. Ryan was, therefore, trying to convince Key to follow the course of treatment which one of the prison doctors had recommended.

*38 Admittedly, there appears to have been a problem with this course of treatment because Key was not prescribed a Klonopin substitute. Ryan, however, is not a doctor. Therefore, he could not prescribe this medication. Nor could he verify the contents of Key's personal supply of Klonopin or authorize her to use this medication while she was incarcerated. Furthermore, as a lay person, there would have been no way for Ryan to know that Key required Klonopin or an appropriate substitute because she was suffering from withdrawal. In short Ryan could only recommend to Key that she follow the orders of the prison doctors.

As this court has held on a previous occasion, prison officials cannot be considered as being deliberately indifferent to an inmate's medical needs simply because they failed to directly respond to a complaint while the prisoner was being seen by the prison medical staff. *See Bagwell, supra,* at 17-18 (granting summary judgment in favor of the Deputy Warden of Gander Hill because this individual was not a doctor and, therefore, could not diagnosis the plaintiff's condition or write him a prescription) (relying on *Durmer,* 991 F.2d at 69); *accord Williams v. Cearlock,* 993 F.Supp. 1192, 1197 (C.D.Ill.1998) ("Prison administrators, having no medical expertise, must rely on health care professionals to assess the needs of prisoners and initiate treatment."). Another district court has explained that

> prison administrations [are] not licensed medical practitioners. Lacking the requisite expertise, they

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 34

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

must necessarily place their confidence in the reports of the prison doctors whenever an inmate disputes a medical opinion as to what treatment is necessary and proper.

See *Zingmond v. Harger,* 602 F.Supp. 256, 260-61 (N.D.Ind.1985).

Thus, when a prison administrator clearly defers to the professional medical judgment of the physicians who are treating an inmate, his reliance on the opinion of the medical staff for the proper course of treatment is sufficient to insulate him from any liability for an Eighth Amendment violation. *See id.* at 261.

Here, Ryan clearly deferred to Dr. Sacre's medical judgment. Although this judgment may have been incorrect, there was no way for Ryan to evaluate the propriety of Dr. Sacre's prescribed course of treatment. [FN11] Ryan, therefore, cannot be held liable for his reliance on Dr. Sacre's medical judgment. *See Bagwell, supra,* at 17-18; *Williams,* 993 F.Supp. at 1197; *Zingmond,* 602 F.Supp. at 260-61. Therefore, the court will grant summary judgment in his favor on Key's Section 1983 claims.

> FN11. To the extent that Key is claiming that Ryan should have deferred to the medical judgment of her personal physician and, therefore, ordered Dr. Sacre to prescribe a Klonopin substitute such as Ativan, there is no evidence that Ryan knew of this doctor's recommendation. Instead, the record shows that, during his conversation with Key, Ryan offered to have a nurse contact Key's personal physician and discuss the matter with him. As a result, Nurse Long called Key's private doctor. During the conversation, she learned that this physician recommended placing Key on Klonopin or an appropriate substitute, such as Ativan. Key does not dispute that this information was subsequently relayed to Dr. Sacre. Thus, unlike the situation in *Martinez v. Mancusi,* Ryan was not disregarding the orders of one of the doctors who had treated Key. 443 F.2d 921, 924 (2d Cir.1970). In fact, without Ryan's intervention, it is not clear that Key's personal physician would have even been contacted.

Thus, the record shows that when Ryan spoke with Key in the prison infirmary, he was not aware of sufficient facts that would give rise to an inference that she faced a substantial risk of serious harm given her medical condition. *See Farmer,* 511 U.S. at 837. Instead, this information came to light *after* Ryan had met with Key. Likewise, there is not evidence suggesting that Ryan actually concluded that Key was facing a substantial risk of serious harm as a result of her condition. *Id.* Therefore, to the extent that Key is attempting to hold Ryan liable for failing to follow the recommendation of her personal physician, the court will grant summary judgment in his favor.

2. Martin, Brewington-Carr, and Williams.

The court will also grant summary judgment in favor of Martin, Brewington-Carr and Williams on Key's constitutional claims. There is no evidence that any of these defendants were personally involved in or aware of Key's situation. Although Key claims that these defendants should have known about her condition because routine administrative reports about the general prison population and the patients in the infirmaries would have crossed their desks, this argument essentially attempts to impose liability on them because they occupy positions of supervisory responsibility within the prison system. *But see Rode,* 845 F.2d at 1207 ("[L]iability [under Section 1983] cannot be predicated solely on the operation of *respondeat superior.*").

*39 Each of these defendants testified that they did not have any personal contact or involvement with Key during her period of incarceration. There is no evidence in the record to suggest anything to the contrary. [FN12] Because there is no indication that any of these three individuals was personally involved in or aware of the treatment which Key

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                         Page 35
Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)
**(Cite as: 2000 WL 1346688 (D.Del.))**

was receiving, the court will grant summary judgment in their favor.

> FN12. To the extent that Key is attempting to hold these three defendants liable because they might have "failed to review the incident reports" prepared by other personnel, this failure was at most negligent and, thus, cannot give rise to liability under Section 1983.

3. The alleged violation of prison regulations.

According to Key, the four prison officials that she has sued violated their own regulations by failing to provide her with adequate medical care. To the extent that these policies and procedures afford Key an independent cause of action, the court concludes that any substantive rights available under these rules and regulations are commensurate with Key's Eighth Amendment rights. The provisions themselves do not appear to confer greater rights upon Key. Nor has Key made this argument. Thus, for the reasons which the court previously stated, summary judgment will be granted in favor of these defendants on these claims.

In any event, the rules and regulations which Key has cited would appear to apply primarily to the medical staff, not to prison administrators. For example, one policy governs how medications are stored in the prison pharmacy. Another sets forth the procedures for taking an inmate's medical history upon entering the Department of Corrections. The final two set forth the approach for addressing the needs of inmates who arrive at the prison intoxicated or chemically dependant. As these two regulations make clear, it is the responsibility of the medical staff, not the wardens or deputy wardens of a facility, to assess and treat the needs of these types of inmates. Consequently, the court will grant summary judgment in favor of Ryan, Martin, Brewington-Carr and Williams on these claims.

4. The claims of assault by other prison inmates or staff.

Key also contends that these four prison officials failed to protect her against attacks from other prison inmates or correctional officers while she was incarcerated. As evidence of these attacks, Key cites to the bruises and injuries that she received while she was in the state of delirium that was apparently caused by her Klonopin withdrawal.

The Eighth Amendment does afford an inmate the right to be protected from violence inflicted by other inmates or prison staff. *See Farmer,* 511 U.S. at 832 (citing *Cortes-Quinones v. Jimenez-Nettleship,* 842 F.2d 556, 558 (1st Cir.1988)); *see also Pelfrey v. Chambers,* 43 F.3d 1034, 1037 (6th Cir.1995) (holding that an unprovoked attack by a prison guard would "constitute[ ] a totally unwarranted, malicious and sadistic use of force to cause harm" in violation of the Eighth Amendment). In order to state a viable claim for failure to protect, an inmate must show that she faced a pervasive risk of harm from other prisoners or guards and that the prison officials displayed deliberate indifference to this danger. *See Riley v. Jeffes,* 777 F.2d 143, 147 (3d Cir.1985).

*40 Even though Key has admitted that at least some of her injuries were self-inflicted and even though Nurse Booz saw Key hit herself on one occasion, Key nevertheless contends that "she was obviously subjected to injury either by other inmates or prison officials" because "it appears that at least some of [her] injuries were inflicted by other persons." [FN13] Key, however, cannot successfully oppose a motion for summary judgment by relying on conclusory statements which her attorneys set forth in their opposing papers. *See Cerva v. Fulmer,* 596 F.Supp. 86, 89 (E.D.Pa.1984) (citing, *inter alia, Robin Constr. Co. v. United States,* 345 F.2d 610, 613-15 (3d Cir.1965)); *accord Williams v. Burlington N. & Santa Fe Ry. Co.,* 13 F.Supp.2d 1125, 1129 (D.Kan.1998) ("In order to defeat a motion for summary judgment, plaintiff cannot rely upon arguments of counsel or allegations that are unsupported by the evidence in the record.") (citing *Thomas v. Wichita Coca-Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.1992)); *Vargas v. Royal Bank of Canada,* 604 F.Supp. 1036, 1045

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 36

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

(D.P.R.1985) ("Legal arguments by counsel in his memorandum of law are not sufficient to defeat a summary judgment request.") (citing *Transurface Carriers v. Ford Motor Co.,* 738 F.2d 42, 46 (1st Cir.1984)). Instead, Key must come forward with *evidence* to support the assertions of her counsel.

> FN13. Key has not argued that the prison officials violated her constitutional rights by failing to protect her from herself. *Cf. Belcher v. City of Foley,* 30 F.3d 1390, 1396 (11th Cir.1994) ("Under the Eighth Amendment, prisoners have a right to ... be protected from self-inflicted injuries....").

Here, the only evidence which Key cites is the presence of bruises on her neck and in the center of her back. There, however, is no evidence that these bruises were caused by anyone other than Key. In fact, Key has completely failed to identify any individual as a possible attacker. She has also failed to provide even one instance when she might have been assaulted. Viewing the evidence in the light most favorable to Key, a reasonable jury could only conclude that Key's injuries were self-inflicted. Key, however, is attempting to hold the prison officials liable for their failure to protect her from others within the prison, not herself. Therefore, the court will grant summary judgment in their favor.

5. The emotional distress claims.

Finally, Key claims that these four prison officials caused her to suffer severe emotional distress. In Delaware, a plaintiff can recover in tort against anyone who "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress...." *See Mattern v. Hudson,* 532 A.2d 85, 85-86 (Del.Super.Ct.1987); *see also Lloyd v. Jefferson,* 53 F.Supp.2d 643, 673 (D.Del.1999) (relying on *Avallone v. Wilmington Medical Ctr., Inc.,* 553 F.Supp. 931, 938 (D.Del.1982).

As *Lloyd* and *Mattern* explain, in order to impose liability, the defendant must engage in conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See Lloyd,* 53 F.Supp.2d at 673 (quoting Restatement (Second) Torts § 46, comment d); *Mattern,* 532 A.2d at 86 (citing same).

*41 Given their lack of personal involvement in Key's treatment, no reasonable jury could conclude that Martin, Brewington-Carr, and Williams acted with this degree of outrageousness. Nor could any reasonable jury conclude that, under the circumstances, the failure of these individuals to act went beyond all possible bounds of decency. Instead, these individuals were simply unaware of Key's situation. Key, however, has alleged that these defendants engaged in deliberate, reckless, wanton, and grossly negligent conduct. She has not claimed that they were simply inadvertent. Therefore, the court will grant summary judgment in their favor.

The court will also grant summary judgment in favor of Ryan on Key's emotional distress claims. No reasonable jury could conclude that he acted atrociously when he visited Key in the BWCI infirmary. He simply recommended that Key follow the course of treatment which the prison doctors had prescribed. Although this course of treatment may not have been entirely proper, Ryan was relying on the professional judgments of the medical staff when he made his recommendation. Furthermore, it was apparently at Ryan's instruction that Nurse Long contacted Key's personal physician. Although Dr. Sacre does not appear to have followed this doctor's recommended course of treatment, any intolerable conduct in this regard did not result from Ryan's actions. For this reason, the court will grant summary judgment in favor of Ryan on Key's emotional distress claim.

IV. CONCLUSION.

When the record is viewed in the light most favorable to Key, a reasonable jury could conclude that Dr. Sacre acted with conscious disregard for Key's serious medical condition when he failed to prescribe her an appropriate Klonopin substitute. For this reason, the court cannot grant summary judgment in his favor. The court, however, will

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 37

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

**(Cite as: 2000 WL 1346688 (D.Del.))**

grant summary judgment in favor of the remaining medical defendants on Key's Section 1983 claims because they either properly responded to Key's medical condition or, at worst, appear to have been negligent in failing to adopt a different course of action. Furthermore, in light of this conclusion, the court will require Key to show cause why her state law claims against these individuals for reckless, wanton, or grossly negligent misconduct should not be dismissed. To the extent that Key desires to assert claims of negligence against these individuals, the court will permit a motion to amend. Finally, the court will grant summary judgment in favor of the prison officials because they either relied on the professional judgments of their medical staff or were not personally involved in the treatment which Key received. The court will issue an order to this effect in conjunction with this opinion.

Not Reported in F.Supp.2d, 2000 WL 1346688 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.